[Crim. No. 8476.   Second Dist., Div. Three.   July 9, 1963.]

THE  PEOPLE,  Plaintiff  and  Respondent,  v.  CECIL
EUGENE WILLIAMS, Defendant and Appellant.

Cecil Eugene Williams, in pro. per., and Paul M. Posner for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

FILES, J.—This is an appeal by a defendant who was convicted of possession of heroin in violation of Health and Safety Code, section 11500. Appellant Williams and Clarence Lacefield were jointly charged and tried before a jury. Each was represented by separate counsel. Both were found guilty. Williams alone has appealed.

In passing upon appellant's contentions that the evidence was insufficient to support the jury's finding of guilt, and insufficient to support the trial court's finding that the search which produced the evidence of guilt was lawful, this court does not weigh the evidence. (*People* v. *Redrick*, 55 Cal.2d 282, 289 [10 Cal.Rptr. 823, 359 P.2d 255].) Since the function of the appellate court is to determine whether there is any substantial evidence upon which the jury and the trial judge could have made their respective findings, this opinion need only state the testimony which supports the judgment.

At about 9 a.m. on February 22, 1962, two Los Angeles Police Officers went to an apartment house on Manhattan Place. Their purpose was to investigate appellant, who they knew had been arrested many times for narcotics violations and who was then on parole following a conviction for a narcotics offense. They had no warrant for an arrest or a search. On arrival they interviewed the landlady and learned that appellant occupied apartment 10. The landlady permitted the officers to use an empty apartment, number 9, which was directly across the hall. The officers then waited in apart-

ment 9, leaving the door ajar so that they could look out. At about 10:30 a.m. a man came to apartment 10 and knocked on the door. A voice inside asked, "Who is there?" The visitor said, "Ernest." As the door of apartment 10 opened, one of the officers left his hiding place and walked to the doorway of apartment 10. He saw defendant Lacefield, just inside the doorway, holding in his hand a hypodermic outfit consisting of an eyedropper and an attached hypodermic needle. The officer entered and arrested Lacefield. At the same time the officers observed appellant about 15 feet away. Appellant was seen to go into the kitchen. The officer then took the eyedropper and needle from Lacefield and proceeded into the kitchen. Appellant was standing by the kitchen table. On the table were a piece of cardboard, various colored balloons, a condom, a funnel, and a small pocketknife with the blade open. White powder was observed on the cardboard and the table. On the sink were another hypodermic outfit and a measuring spoon with a blackened bottom and some debris in the bowl of the spoon.

The officer testified that in his experience balloons are used as containers of heroin for street sale and condoms are used to package larger amounts.

After the officer observed what was on the table he said to appellant, "All right, where is it?" Appellant replied, "It is down the sink." The officers said, "Well, how much was there?" Appellant said, "There is a couple of caps." At that time the officer noticed on appellant's right thumb and first finger a whitish powder. The officer attempted to seize appellant's hand to remove some of the powder, but appellant pulled his hand away and rubbed his fingers together, removing the powder. At this point appellant was placed under arrest.

The officers then searched the apartment. In a trash box which was next to the kitchen table they found more loose powder. Subsequent analysis by a chemist showed that the white powder found on the cardboard and in the trash box was heroin. The debris in the spoon was also heroin.

When the officers questioned Lacefield at the apartment he first said he knew nothing about the heroin in the apartment. Later Lacefield told them that "All that stuff is mine," referring to the heroin in the kitchen.

Both of the defendants testified at the trial. Lacefield confirmed the testimony of the officer that he had been arrested

while standing in the doorway with a hypodermic kit in his hand. He said that the apartment belonged to appellant and that he, Lacefield, had been there for a couple of days. He said he had purchased the heroin the night before and appellant had no knowledge of any narcotics there. The heroin, according to Lacefield, was in the condom which he had left in the icebox in the kitchen overnight. In the morning, he was working with it on the kitchen table. He was chopping it with the knife, preparing to put it in the balloons. He had taken an injection a few minutes before the officers arrived. This was the fourth injection he had taken out of this heroin which he had acquired the night before, but the first injection that morning. The hypodermic kit he had carried to the door was his own, but he knew nothing about the other kit which had been found on the sink.

Appellant testified that he had been asleep when the officers entered, and that he had been awakened by the sound of a scuffle. He said he had been up about 45 minutes earlier and had been in the kitchen, where he had made coffee, but until the .officers arrived he had no knowledge of any narcotics or any hypodermic kit or any balloons in the apartment. He testified that the apartment was his, that Lacefield had been there two nights, and that he knew that Lacefield had been a user of heroin.

It was not unlawful for the officers to conduct a surveillance of the common hallway of the apartment house with the consent of the manager. (*Britt* v. *Superior Court,* 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817].)

Appellant's reliance upon *Bielicki* v. *Superior Court,* 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288], is misplaced. In the *Britt* case the court said (p. 472): ''The crucial fact in *Bielicki* was neither the manner of observation *alone* nor the place of commission *alone,* but rather the manner in which the police observed a place—and persons in that place—which is ordinarily understood to afford personal privacy to individual occupants. Of course, clandestine observations by police officers of premises devoted to common use by the general public—such as, for example, the shopping areas and public hallways and elevators of the department store here involved —is not prohibited by our decision in *Bielicki*.''

The information upon which the officers arrested Lacefield was discovered after they had left their place of concealment and had crossed the hall to the door of appellant's apart-

ment. To observe Lacefield standing in the open doorway did not constitute an unreasonable search. (*People* v. *Martin*, 45 Cal.2d 755, 762 [290 P.2d 855].)

The fact that Lacefield appeared in the doorway carrying his hypodermic kit gave the officers reasonable grounds to believe that he was in possession of heroin. Appellant suggests that Lacefield might have been administering some lawful drug, such as insulin. On this point the officers and the trial judge were entitled to consider that the instrument was not a syringe of the type which is manufactured for medical use, but was the combination of an eyedropper with a hypodermic needle so commonly associated with the injection of heroin. They were also entitled to consider that this was the apartment of a man with a history of narcotics violations. "Probable cause for an arrest is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Fischer*, 49 Cal.2d 442, 446 [317 P.2d 967].) The circumstances here justified such a "strong suspicion."

After making a lawful arrest of Lacefield, the officers were entitled to search the apartment to find the heroin which they reasonably believed Lacefield had been using. What they saw in the kitchen, together with appellant's admissions, amply justified his arrest.

The evidence supports the jury's finding that appellant was guilty of possession. The heroin and the paraphernalia for processing it were spread out on the kitchen table in appellant's apartment in the middle of the morning. The heroin had been in the apartment at least since the previous day and Lacefield had taken at least four injections during that period. The jury did not need to believe appellant's story about being asleep in the bedroom, particularly when the officer saw appellant walk rapidly from the hallway to the kitchen as the officer approached the front door. It was a reasonable inference that while the officers were arresting Lacefield, appellant was pushing the loose heroin off the work table into the trash box; and that his statement, "It is down the sink," was an attempt to divert the officers from searching the trash box.

The trial judge gave the jury the following instruction on the meaning of "possession":

"Within the meaning of the law, a person is in possession

of a narcotic when he knowingly has the narcotic under his dominion and control, and, to his knowledge, it either is carried on his person or is in his presence and custody, or, if not on his person or in his presence, the possession thereof is immediate, accessible, and exclusive to him, provided, however, that two or more persons may have joint possession of a narcotic if jointly and knowingly they have the dominion, control and exclusive possession I have described.''*

Appellant does not question the propriety of that instruction, but contends that the court erred in refusing to give two additional instructions which he requested. Those refused instructions are as follows:

"DEFENDANT WILLIAMS REQUESTED INSTRUCTION No. 1

"You are hereby instructed that the mere fact that narcotics were found in the apartment of the defendant CECIL EUGENE WILLIAMS, which was jointly occupied by CLARENCE LACEFIELD, is insufficient to support a conviction of CECIL EUGENE WILLIAMS and your verdict must be not guilty as to defendant CECIL EUGENE WILLIAMS if you also find that the defendant CECIL EUGENE WILLIAMS was unaware of the presence of the narcotics in the apartment."

"DEFENDANT WILLIAMS REQUESTED INSTRUCTION No. 2

"You are further instructed that if you find that the defendant CECIL EUGENE WILLIAMS did not have exclusive control and dominion of the apartment where the narcotics were found and you do not find that the defendant CECIL EUGENE WILLIAMS was a narcotics user and you do not find that the defendant CECIL EUGENE WILLIAMS had actual knowledge of the presence of the narcotics in the apartment you must find the defendant CECIL EUGENE WILLIAMS not guilty."

If it was desirable to amplify the statement of law contained in the given instruction on the meaning of "possession," the proposed instructions were not appropriate in this case and they were properly refused.

The first clause of proposed instruction 1, referring to the "mere fact that narcotics were found in the apartment," is misleading as applied to the evidence in this case. To be sure, there are cases where the finding of narcotics in an apartment is insufficient to convict the tenant. An example is *People* v. *Savage,* 128 Cal.App.2d 123 [274 P.2d 905], where the circumstances indicated the likelihood that the narcotics had

---

*This is an exact copy of California Jury Instructions - Criminal (CALJIC) Form 703.

been hidden there by someone else. But the present case involves no "mere" finding of narcotics. Defendant Lacefield testified that heroin in its distinctive container had been in the icebox overnight. In the middle of the morning someone had been cutting and packaging heroin on the kitchen table, someone had been cooking and injecting it, and the paraphernalia for all this was in plain sight. These conditions, which were conceded to exist, were strong circumstantial evidence that appellant had knowingly made his apartment a heroin-processing establishment. The finding of the narcotics under these circumstances was evidence of appellant's guilt, to be weighed by the jury against appellant's testimony that he was ignorant of what was there.

Proposed instruction number 2 raised two false issues: appellant's control of the apartment, and use of narcotics. Appellant had admitted that the apartment was his, and hence he had full control except as to such activities as may have been carried on by someone else surreptitiously. The real issue was not appellant's control of the premises, but whether Lacefield had brought the heroin into the apartment without appellant's knowledge or consent. It was, of course, no part of the People's case to prove that appellant was a narcotics user, and to ask the jury to make a finding on that issue could be misleading.

Appellant contends that the prosecutor was guilty of prejudicial misconduct in cross-examining him as follows: "Q. Now, as a matter of fact, Mr. Williams, didn't you ask Mr. Lacefield to, as you said, take this for you on this heroin? A. I don't believe that I would insult Lacefield with such a question as take a felony for me. Q. You know that with your record that a sentence that you might get would probably be more severe than his, don't you? MR. DE ARMOND: I object to this. THE COURT: The objection will be sustained."

In his examination in chief Lacefield testified that when the officers first came in, "I told them that I knew nothing about any heroin." On cross-examination he stated he first told the officers it was his heroin about the third time they talked to him. The cross-examination continued: "Q. Just before that didn't you ask them if they would let you talk to Cecil, that you and he might work this thing out, then you could, then you would talk to them again? A. Yes, I did." Although Lacefield did not say directly that he had been al-

lowed to confer privately with appellant, the cross-examiner not unreasonably assumed that this had occurred.

Lacefield's first statement, that he knew nothing of the heroin in the kitchen, necessarily implied that appellant was the guilty one. Immediately after the conference Lacefield asserted that appellant was innocent. It was not improper for the prosecutor to inquire of Lacefield whether appellant had asked him to change his story.

The suggestion of fact contained in the last question, to which an objection was sustained, surely could not have been prejudicial. The cross-examination had already brought out, by way of impeachment, appellant's record of three prior felony convictions. The most innocent juror would be likely to assume, without any suggestion from the prosecutor, that a man convicted of his fourth felony would probably receive a more severe punishment than a man with no prior felony record.

In weighing the defendants' testimony that Lacefield alone was responsible, the jurors would inevitably ask themselves whether Lacefield, being inextricably involved, was not fabricating in the hope of saving Williams from a fourth felony. ■ ■ Appellant's final contention is that the district attorney committed prejudicial misconduct in argument by referring to tape recordings. The evidence showed that the interrogation of the defendants after the arrest had been recorded. One of the officers stated the substance of the conversation and produced the tape, which was marked for identification. The tape was not played for the jury nor was it offered or received in evidence. In arguing to the jury, the district attorney referred to what was said in the "recorded conversation." Appellant's counsel objected to this upon the ground that the tapes were not in evidence. The trial court admonished the jury that the tapes were not in evidence and that the jury should not speculate as to what was in them.

Appellant's contention here is that the prosecutor's argument to the jury misstated the testimony of the officer as to the substance of the recorded interview; and that in mentioning the tapes the prosecutor implied that the tapes contained something more than what was in the testimony of the officer. An examination of the record does not bear out this criticism.

Specifically, the prosecutor told the jury: "In that recorded conversation Mr. Williams acknowledged that he had said in the kitchen that he had thrown the heroin away.

Had acknowledged that he had some powder on his fingers."

The officer's testimony, in describing the recorded conversation, included the following: "I then asked him about the powder which I had found on his hands at the time of arrest. He stated that must have been powder or dust or something, that he had been eating doughnuts and had had sugar in his coffee, that he didn't know just what it was. I then said, 'Well now, you told me when I first came in that it is down the sink, there was a couple caps down the sink.' And he stated, 'You said where is it, I said it is down the sink. As far as I was concerned anything was down the sink.' I then stated to Mr. Williams, 'Well, you said there was a couple of caps down the sink.' He says, 'I don't know.'"

It was not improper for the prosecutor to argue that this testimony showed that appellant had acknowledged that he had said in the kitchen that he had thrown the heroin down the sink. It is unfortunate that the district attorney laid himself open to this attack by mentioning the tape at all, but it does not appear that he was suggesting to the jury that the tape contained any more than what the officer had described of the conversation. It does not appear that the jury could have been misled by this episode.

The order denying a new trial and the order denying a motion for the suppression of evidence are not appealable (Pen. Code, § 1466) and hence the purported appeals from those orders are dismissed. The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied July 25, 1963, and appellant's petition for a hearing by the Supreme Court was denied September 4, 1963.