[Crim. No. 10096.   In Bank.   Feb. 8, 1967.]

THE  PEOPLE,  Plaintiff  and  Respondent,  v.  GILBERT
RODRIGUEZ GARAVITO, Defendant and Appellant.

Ralph F. Bagley, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, David S. Sperber and Leslie F. Bell, Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—Defendant was charged with unlawful possession of narcotics in violation of section 11500 of the Health and Safety Code and with a prior conviction under that section. He pleaded not guilty, and waived a jury trial. The court found him guilty of both charges. Defendant appeals.

The facts are not materially in dispute. Officer Villahermosa was a deputy sheriff assigned to the narcotic detail, and experienced in that work. On information received from an informant not known to be reliable, and on information received from several radio car deputies to the effect that they had observed male visitors, at varying hours of the day and night, visit the premises for short intervals, Villahermosa decided to observe the premises personally. He did so. On one occasion he observed conditions for an hour and a half and, during that time, saw four men enter the premises at various times, staying but three to five minutes. On a later occasion he

observed defendant, then unknown to him, approach the premises with his wife and child. The wife entered the house from the front, but defendant entered from the rear. Although this last observation involved nothing in itself suspicious, the other activities observed made Villahermosa reasonably suspect that the occupants may have been engaged in illegal narcotic activity.

On July 16, 1964, at about 9 p.m., Villahermosa, and Deputies Burkett and Burley, also of the narcotic detail, in civilian dress, approached the premises. Deputies Villahermosa and Burley went to the front door, which was open, and knocked on the locked screen door. Deputy Burkett went to a point where he could observe the rear entrance but did not then enter the rear yard. All three deputies could see the interior of the house through the windows, on which the shades were not drawn, and could see two men in the kitchen. A woman responded to Villahermosa's knock and asked him what he wanted. He asked if Bobby Garcia was there, a name that had been given him by the informant as a possible occupant, and the woman answered that he was not, and then she asked the deputy who he was. He said that his name was Villahermosa, and that ''We're from the Sheriff's Narcotics.'' This statement was, of course, heard by Deputy Burley who was on the front porch, and also by Deputy Burkett who was near the back gate. It was also apparently heard by the two men in the house because they immediately stopped what they were doing and began moving rapidly towards the rear of the house. When Deputy Burkett saw the men run towards the rear door, he entered the backyard and crouched near the house. He saw the two men hesitate on the service porch, glance towards the living room, and then come out the rear door. He believed that they, from their actions, were involved in narcotics and were trying to dispose of them. He jumped from his hiding place, identified himself as a narcotic officer, and told the men to stop. He grabbed one of the men, not the defendant. The defendant ran back into the house with a white package crumpled in his right hand. In the meantime Officer Burley arrived from the front of the house and the captured person was turned over to him. Burkett followed the defendant into the house, opened the screen door for Deputy Villahermosa, and then proceeded into the bedroom where he saw defendant leaning over the baby's crib, now with nothing in his hands. Burkett ordered Villahermosa to search the crib, which he did, and the deputy found, in the baby's diaper, a

white package containing what turned out to be four bindles of heroin and some narcotic paraphernalia. Defendant was then immediately arrested. A subsequent search of the house disclosed more narcotics.

■ The arrest and search were legal. Although the deputies had neither an arrest nor search warrant they did have reasonable cause to believe a felony had been committed. They did not break into the house until the occupants had, by their actions, given them reasonable cause to believe that a crime was being committed. Under the circumstances, the search was incident to a lawful arrest based on probable cause. (*People* v. *Simon*, 45 Cal.2d 645, 648 [290 P.2d 531]; *People* v. *Torres*, 56 Cal.2d 864, 866 [17 Cal.Rptr. 495, 366 P.2d 823].)

■ Villahermosa had certain information and had personally observed several men visiting the residence, staying short periods, and departing. Under such circumstances, the police certainly were at least legally entitled to investigate. They came to the house, commendably knocked and identified themselves. Immediately the two male occupants started to run towards the rear of the house. Deputy Burkett, who had observed these furtive and suspicious actions, apprehended one of the two men. He then followed defendant into the house and observed him leaning over the baby's crib now without the white package in his hands which he had had a few moments before. Reasonable grounds for the arrest and subsequent search were then present. (*People* v. *Amado*, 167 Cal. App.2d 345 [334 P.2d 254]; *People* v. *Martin*, 46 Cal.2d 106 [293 P.2d 52]; *People* v. *Privett*, 55 Cal.2d 698, at p. 702 [12 Cal.Rptr. 874, 361 P.2d 602].)

But we must agree with defendant that the actions of the officers after the arrest violated defendant's constitutional rights under the rules announced in *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], as interpreted in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Such violation requires a reversal. Inasmuch as the events here involved and the trial occurred after *Escobedo, supra,* was decided, i.e., after June 22, 1964, there can be no question but that the rules of that case as interpreted in *Dorado, supra,* are applicable. (*Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772].)

■ That a violation occurred seems quite clear. Admittedly, immediately after the search, defendant was placed under arrest. This, as already pointed out, was a lawful arrest, based on probable cause. Defendant was in custody. He

was not advised of his constitutional right to an attorney or of his right to remain silent. Immediately after the packages had been discovered in the crib and defendant had been arrested, Deputy Villahermosa showed the packages to defendant. Officer Burkett asked if they were his and defendant answered, "No." Burkett continued the questioning for three or four minutes asking defendant, two or three more times, if the articles were his. Defendant denied that the articles belonged to him. During this period Officer Burkett stated that he believed everyone in the house would have to be taken to jail. This included not only the two men but defendant's wife and child. Thereafter, defendant "finally stated, yes, that it was his."[1] Then Burkett asked why he had hidden the narcotics in the baby's diaper. Defendant replied that he thought it a safe place. Burkett then asked if there were further narcotics in the house. Defendant said no. After a further search had disclosed more narcotics, these were shown to defendant, and he was asked if they were his. At first he denied any knowledge of them but later in response to direct questions he stated they were his and that he had forgotten them.

There is no doubt that the securing of the confessions under such circumstances violated defendant's constitutional rights and requires a reversal. Clearly there was custodial interrogation without the safeguards announced in *People* v. *Dorado, supra,* and *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97] (affd. *sub. nom. Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). Suspicion had clearly focused on defendant. He was in custody after an arrest based on reasonable grounds. The questions were not investigatory, but considering the time they were asked, after arrest, and their content and obvious purpose, they were clearly accusatory. They were asked for the purpose of eliciting incriminatory statements. They were not exculpatory, but constituted admissions of ownership of the narcotics. They were, in effect, confessions.

The crux of *Escobedo, supra,* as interpreted in *Dorado, supra,* is that an accused is entitled to the warnings required by the Constitution after he is in custody and suspicion has focused on him. Thereafter, the accusatory stage having been reached, the police are prohibited from directing questions to him that are intended to elicit incriminatory

[1]Since the case must be reversed on *Escobedo, supra,* grounds, it is not necessary to determine whether this threat constituted coercion under the rules laid down in *Haynes* v. *Washington,* 373 U.S. 503 [10 L.Ed.2d 513, 83 S.Ct. 1336].

statements without giving him the required warnings. Here the defendant was under arrest. Suspicion had focused on him. The questions asked were intended to elicit incriminating information. No warnings were given. Confessions were thus secured. This was reversible error.

▮ In spite of the fact that evidence other than the confessions may be ample to support the finding of guilt, the erroneous admission of the confessions requires a reversal. (*People* v. *Dorado, supra*; *People* v. *Stewart, supra.*)

Since a reversal has been ordered, and defendant will undoubtedly be retried, it is unnecessary to now determine whether the trial court in the instant case also abused its discretion in refusing to order defendant to the narcotic rehabilitation center for examination and treatment. That issue can properly be determined on the retrial. Attention is called to the fact that any discretion the trial court may have in such a situation should be "exercised with a view to implementing, rather than possibly frustrating, the strong legislative policy disclosed by the enactments creating and governing the narcotic addict rehabilitation program." (*People* v. *Ortiz*, 61 Cal.2d 249, 254-255 [37 Cal.Rptr. 891, 391 P.2d 163].)

The judgment is reversed.

Traynor, C. J., Tobriner, J., and Peek, J.,* concurred.

MOSK, J.—I dissent.

This trial was held prior to June 14, 1966, and therefore is not controlled by the inhibitions of *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. (*Johnson* v. *New Jersey*, 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772].) Under these circumstances, I am persuaded by the dissent of Mr. Justice Fleming in the Court of Appeal (50 Cal.Rptr. 368), and adopt it *in haec verba* as my conclusion:

In my view Garavito's statements to the police on the scene at the time of the raid were given during the investigatory phase of the case and properly admitted in evidence. (*People* v. *Stewart*, 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Cotter*, 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862]; *People* v. *Jacobson*, 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555].)

The police, acting on information from informers and on

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

their own observations of activities at particular premises, made a raid at 9 p.m. on a house about whose occupants they had little specific knowledge. Three adults were on the premises. Garavito was seen running into the baby's bedroom and was apprehended near its crib. In the baby's clothes narcotics and narcotic paraphernalia were found, which after initial denials Garavito within three or four minutes admitted were his. More narcotics were found in a child's jacket in the closet of the same bedroom, and Garavito after an initial denial stated these too were his. Both admissions took place in the baby's bedroom within the first 10 minutes of the raid.

With three people in the house about whose history the police knew nothing, it appears to me that the questioning on the scene was properly investigatory and authorized by the rule of *People* v. *Stewart,* 62 Cal.2d 571, 578-579 [43 Cal.Rptr. 201, 400 P.2d 97]. The immediate sorting out of facts, evidence, participants, and bystanders during the actual occurrence and confusion of a raid serves an essential purpose for all parties concerned and in no real sense can be considered part of the accusatory stage. Under these circumstances the danger of coercive pressure attendant upon an accusatory questioning does not exist. In substance, these conversations were part of the res gestae of the arrest and properly admissible in evidence.

The only other point in the case was Garavito's argument at his trial that his admissions had been made under duress because of Officer Burkett's declaration in the bedroom that everyone in the house would have to go to jail. This contention was unsupported by any testimony from the defendant that he did in fact act under duress, but nevertheless was considered by an experienced trial judge, . . . who found that there had been neither duress nor coercion. There was substantial evidence to support his finding, and we should not disturb it on appeal. (*People* v. *Jones,* 221 Cal.App.2d 37, 40 [34 Cal.Rptr. 267].)

I would affirm the conviction.

McComb, J., and Burke, J., concurred.