[Crim. No. 11865.   Second Dist., Div. Five.   Feb. 24, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM W. MILLER, Defendant and Appellant.

732

Marshall K. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward A. Hinz, Jr., and Anthony S. Dick, Deputy Attorneys General, for Plaintiff and Respondent.

KAUS, P. J.—In case number 291181 defendant was found guilty of a violation of section 11500 of the Health and Safety Code (possession of heroin), in case number 299317 of a violation of section 11500.5 (possession of heroin for sale). In each case he was sentenced to state prison for the term prescribed by law, the two sentences to run concurrently.[1] He has appealed each conviction.

### Case No. 291181

Officer Barber, attached to the narcotics division of the Los Angeles Police Department received a telephone call from a lady who lived in the front of premises known as 818½ West 12th Street. He interviewed her. She said that she thought that there was narcotics activity in an upstairs apartment to

---

[1]Neither trial took place before the judge [Mark Brandler] who sentenced defendant and from whose judgments the appeals were taken.

the rear. She said numerous persons, mostly males, came and went at all hours. She had smelled marijuana smoke coming out of an open bathroom window; she was a nurse and knew what marijuana smelled like. She had also seen a woman who lived there go into the bathroom with different men, stay a short period of time and then leave.

A gentleman who lived in a downstairs apartment at the same address corroborated the coming and going of numerous persons.

The officer and a partner then placed the premises under surveillance and did see ''quite a few people coming and going from the apartment, male persons.''

Finally the owner of the apartment, Mr. Parker, got in touch with the officer and said that he had spent some time in a service station across the street watching his property and that ''there were an unusually large number of persons coming and going, that he thought it was narcotics activity and that he wanted to do something about it.''

As a result of all this Officer Barber in the company of Sergeant Frederickson went to the premises on June 30, 1964. He observed one Cruz and one Caldwell get out of a car and walk rapidly into the apartment in question.[2] A few minutes later Cruz emerged from the apartment. Frederickson called to him: ''Just a minute, we are police officers, we want to talk to you.'' Cruz looked in the direction of the officers, put his head down, his hand to his mouth, turned and ran. Frederickson caught up with him and applied a hold below Cruz' chin which prevented him from swallowing anything he might have put in his mouth. Barber observed Cruz attempting to swallow a paper ''bindle'' which was only partially in his mouth and recovered it. The bindle contained white powder.

Barber looked upstairs and saw someone looking out the window. He ran to the door, banged loudly and hollered: ''Police Officers, open up.''[3] He heard footsteps ''running away'' from the door. At that time, based on his experience, it was his opinion that the white powder in the bindle was heroin. He then forced the door and ran up the stairs. As he reached the stairs he saw defendant Miller run toward the

[2]Cruz and Caldwell were codefendants with Miller. Caldwell was acquitted. Cruz was found guilty, but any appeal he may have filed is not before us.

[3]The evidence shows that the stairs leading up to the apartment in question were behind the door. In other words the door to the apartment was at ground level.

734

bathroom. He was carrying a brown paper wrapper "and on it was white powder." He tried to dispose of the wrapper and its contents in the toilet, but the officer prevented him from doing so and recovered a portion of the contents and the wrapper.

It was stipulated at the trial that a chemical investigation revealed that the white powder taken from Cruz and the white powder which Miller attempted to dispose of were heroin.

■ Defendant argues that the arrest of Cruz was not based upon sufficient cause and that the heroin found on him could therefore not be used as the basis for a legal entry into the apartment in which he was discovered. We disagree. Before Cruz was arrested the officers had information from three responsible citizens that things were going on at the apartment which were unusual and which certainly were compatible with the suspicion that it was being used for trafficking in narcotics. Such a suspicion was strongly corroborated by the nurse who had identified marijuana odor. The veracity of the three informants was personally verified by the officers. Then they saw Cruz enter the apartment and leave a few minutes later. When accosted by the officers he fled and put his hand to his mouth. We believe that all these matters put together justified the arrest. Defendant's strongest case, *People* v. *Garrett*, 237 Cal.App.2d 701 [47 Cal.Rptr. 194], is distinguishable. There the police officers acted on the basis of information received from two informants whom they refused to identify at the trial. As far as the report of the case shows, they stopped the first two people who emerged from the apartment in question, without having in any way corroborated any of the information given to them. Division four of this court felt that on these facts no reliance whatever could be placed on the unidentified informants and that the People had to rely solely on the fact that, when stopped, defendant ran and made a motion to his mouth. Here we have far more. The informants were identified, though not by name,[4] and they were apparently reliable citizens anxious to stop what they suspected was illegal conduct. The very same division of this court which wrote *People* v. *Garrett, supra,* also filed *People* v. *Lewis,* 240 Cal.App.2d 546 [49 Cal.Rptr. 579]. In that case the court explains that a valid distinction

[4]Officer Barber, on direct examination, revealed sufficient facts to enable an investigator to locate the informants in question. On cross-examination he was not asked to give their names.

may be made between stool pigeons who assist the police for selfish motives of one kind or another and responsible citizens who desire to aid in law enforcement. (See also *People* v. *Pressley*, 242 Cal.App.2d 555 [51 Cal.Rptr. 563].)

██ Complaint is made that the extracting of the bindle from Cruz' mouth violated due process. (*Rochin* v. *California*, 342 U.S. 164 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396].) The parties appear to agree that the crucial question is whether or not the hold applied by Sergeant Frederickson "choked" Cruz. (*People* v. *Tahtinen*, 210 Cal.App.2d 755, 759 [26 Cal.Rptr. 864].) Whether or not there was such an effect was a question of fact resolved by the trial court. Officer Frederickson testified one way, Cruz attempted to testify to the contrary, but even he admitted that he was able to breathe. Moreover, the officer demonstrated the hold for the benefit of the court and we must assume that the demonstration supported the implied finding in favor of the People.

Finally it is argued that the entry into the apartment was not justified by the discovery, on Cruz' person, of what appeared to be heroin. This point is completely answered by *People* v. *Sandoval*, 65 Cal.2d 303, 307-308 [54 Cal.Rptr. 123, 419 P.2d 187]. The facts in that case are quite parallel and no further discussion is necessary.

### Case No. 299317

The events which led to defendant's conviction in case number 299317 took place while he was free on bail after having been found guilty in case number 291181, but before judgment was pronounced.

Before January 10, 1965, Officer Sanchez of the narcotics division of the Los Angeles Police Department was told by Sergeant Frederickson that Frederickson had heard that defendant was living in a certain apartment house on Coronado, that he was in possession of a large amount of heroin which he was going to transport to a certain nightclub later that day and that he would probably be in the company of a female. No attempt was made to establish that Sergeant Frederickson's informant was reliable.

Sanchez and a partner then went to the apartment house in question. They talked to the manager and verified that defendant occupied one of the apartments. The manager said she was very glad to see the officers, because she had had numerous complaints about a large amount of foot traffic going in and out of his room which was disturbing all of her tenants.

She and the officers then went to defendant's room. By prearrangement with the officers she knocked on the door and when defendant asked who it was, she said "You have a caller" and left. Officer Sanchez explained his reason for this procedure as follows: "In past experience I have found that if I had gone to the door myself and said, 'Bill,' he'd have asked who it was; and if I had said, 'Police officer,' he would have flushed everything down the toilet. I wanted to find out if he was there, if there would be an easier way than to force the door open." About two minutes later defendant opened the door "the length of a night chain." Right then the officer observed a plate, a funnel and several balloons scattered on the floor. He immediately identified himself as a police officer. Defendant slammed the door and started to shout to someone in the room. The record contains two versions of what he said. The more delicate one is: "Get rid of the stuff. It's the heat. Get rid of it, you dumb bitch, get rid of it. It's there on the floor."

The officers then forced the door open. Defendant was very combative, but was eventually subdued. A female who was on the premises kept running back and forth across the room. The object of all this exercise is obscure, because the dish, the funnel and the balloons remained in plain view of the officers.

The balloons were eventually found to contain heroin.

■ Defendant argues that the convictions must be reversed because the probable cause to enter his room was the view of the balloons and paraphernalia which the officers obtained when he opened the door in response to the manager's announcement that he had a "caller." Reliance is mainly placed on *People* v. *Reeves*, 61 Cal.2d 268 [38 Cal. Rptr. 1, 391 P.2d 393], a case in which the facts were strikingly similar. Knowing that Reeves had a claim pending against a railroad, the officers requested the manager of his hotel to telephone him and to tell him falsely that there was a registered letter from the railroad company at the desk. They then stationed themselves outside of his door and when he opened it observed a partially consumed marijuana cigarette on a table. The Supreme Court said: "Unless the officers had reasonable cause to enter Reeves' room before the door was opened they cannot lawfully rely on any information secured by inducing the opening of that door by ruse or subterfuge. It is well settled by both federal and state decisions that 'an entry obtained by trickery, stealth or subterfuge renders a

search and seizure invalid' (*People* v. *Roberts,* 47 Cal.2d 374, 378 [303 P.2d 721] ; to the same effect see *People* v. *Albert,* 182 Cal.App.2d 729, 737 [6 Cal.Rptr. 473] ; *Gouled* v. *United States,* 255 U.S. 298, 305 [65 L.Ed. 647, 651, 41 S.Ct. 261] ; *Fraternal Order of Eagles, No. 778* v. *United States,* 57 F.2d 93)." (*Ibid.,* p. 273.)

The Attorney General distinguishes Reeves by pointing out that in that case the hotel manager lied, while here she spoke the truth. Defendant had "callers."

Leaving aside the question whether a policeman who is attempting to search the room of his "host" for the purpose of sending him to prison for a period of not less than 5 nor more than 15 years (Health & Saf. Code, § 11500.5) is a caller, we do not believe that *Reeves* can be circumvented simply because no lie is uttered. The federal cases on which *Reeves* relies state the rule even more broadly. In *Gouled* v. *United States,* 255 U.S. 298, 306 [65 L.Ed. 647, 41 S.Ct. 261] the language is as follows: "Without discussing them, we cannot doubt that such decisions as there are in conflict with this conclusion are unsound, and that, whether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through *social acquaintance, or in the guise of a business call,* and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence falls within the scope of the prohibition of the 4th Amendment, and therefore the answer to the first question must be in the affirmative." (Italics added.)

In *People* v. *Porter,* 227 Cal.App.2d 211 [38 Cal.Rptr. 621], defendant's roommate was one Willard Harris, apparently known as Bill. The government agents caused defendant to open the door by replying in the affirmative when, in answer to the ringing of the bell, defendant asked: "Is that you, Bill?" The court held as follows: "It was an unlawful invasion of the security of defendant's home for the officers to cause the door to open, even if the defendant pulled it open upon the representation that 'Bill' was outside." (*Ibid.,* pp. 214-215.) In a footnote to this passage the court says: "The Attorney General's brief suggests, somewhat delicately in a footnote, that 'from all that appears in the record, Sergeant Kenney's first name may well have been "Bill." ' The case does not turn upon whether the sergeant had the same nick-

name as defendant's roommate. There is no reasonable basis for inferring that any of the four officers who approached defendant's home was the 'Bill' whom defendant was expecting and for whom he was willing to unlock the door to an apartment at 3 o'clock in the morning.'' (*Ibid.*, p. 215.)

We can see no difference between a case where the Bill at the door is not the Bill whom the defendant was expecting and one where the ''caller'' is not of the kind for whom defendant would have opened the door, at least not without tidying up a bit.[5]

It is argued that the officers did not employ their ruse to make a visual search of the apartment, but that they were merely seeking an interview. The ''sneak peek''—the People's characterization—was an unexpected dividend. This is speculation. The record here is as silent on the officers' motives as the facts recited by the Supreme Court in *People* v. *Reeves, supra.* It seems inescapable that they hoped for enough ''action,'' verbal or visual, to enable them to make a valid arrest.

It remains to be seen whether certain recent opinions of the Supreme Court of the United States imply that what was thought to be unconstitutional in *People* v. *Reeves, supra,* is perhaps not so bad, after all. On December 12, 1966, the court decided *Hoffa* v. *United States*, 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408] and *Lewis* v. *United States,* 385 U.S. 206 [17 L.Ed.2d 312, 87 S.Ct. 424].[6]

The facts in *Lewis* were that an undercover federal narcotics agent called Lewis at his home, falsely identified himself as ''Jimmy the Pollack'' and said that a friend had told him that Lewis might be able to supply marijuana. Lewis replied in the affirmative and asked the agent to come to his house for the purchase. The agent did so and after some conversation inside Lewis' house the deal was consummated on the front porch. This procedure was repeated two weeks later. Before the Supreme Court Lewis argued that: ''any official intrusion upon the privacy of a home constitutes a Fourth Amendment violation and that the fact the suspect invited the intrusion cannot be held a waiver when the invitation was induced by fraud and deception.'' (*Ibid.*, p. 208 [385 U.S. 206].)

---

[5]The manager and defendant both testified that she did not announce a ''caller'', but that she said he had a telephone call. We must assume that this version was not believed by the trial court.

[6]A third case decided that day, *Osborn* v. *United States*, 385 U.S. 323 [17 L.Ed.2d 394, 87 S.Ct. 429], while involving similar problems, has no direct relevance here.

The court held that no such violation took place. *Gouled* v. *United States, supra,* was distinguished in that there, pretending to be a social visitor, a business acquaintance of Gouled, acting under orders of federal officers, obtained entry into Gouled's office and then, in Gouled's absence, ransacked the place and found incriminating papers. In *Lewis,* on the other hand, the federal agent obtained exactly what Lewis was willing to give him. "During neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business." (*Ibid.,* p. 210 [385 U.S. 206].) The place which the agent entered was only incidentally the home of the defendant. In reality it was his place of business and all that happened between the agent and the defendant is that the business was carried on. Deception is necessary at times to accomplish the mission of police departments and does not, by itself, violate the Constitution.

It seems clear to us that the very reasoning of the Supreme Court in *Lewis* indicates that our Supreme Court was correct in *Reeves.*

In *Lewis* the fact that the sale, which Lewis would not have made had he known the identity of the buyer, took place at his home was not the fruit of the deception. Lewis was eager to sell and the agent was eager to buy. To neither party did it make one particle of difference whether the transaction took place at the home, in the street or in a bar.

In *Reeves* and in the case at bar the situation is radically different. It is one thing to use deception to cause the defendant to do something which he would not otherwise have done—but it is quite another matter to use trickery for the purpose of making a visual entry into his room, in other words, a search. (*Bielicki* v. *Superior Court,* 57 Cal.2d 602, 605 [21 Cal.Rptr. 552, 371 P.2d 288].) That this distinction is sound is pointed up by *Hoffa* v. *United States, supra.* There, one Partin, a pretended friend of Hoffa's, but secretly a government informer, had various conversations with the defendant which he later related to the authorities and which were introduced against Hoffa at his trial. Since many of these talks took place in Hoffa's hotel room, it was claimed that the deception violated his Fourth Amendment rights. This is part of the court's answer: "Where the argument falls is in its misapprehension of the fundamental nature and scope of Fourth Amendment protection. What the Fourth Amendment protects is the security a man relies upon when

he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. There he is protected from unwarranted governmental intrusion. And when he puts something in his filing cabinet, in his desk drawer, or in his pocket, he has the right to know it will be secure from an unreasonable search or an unreasonable seizure. . . .

"In the present case, however, it is evident that no interest legitimately protected by the Fourth Amendment is involved. It is obvious that the petitioner was not relying on the security of his hotel suite when he made the incriminating statements to Partin or in Partin's presence. Partin did not enter the suite by force or by stealth. He was not a surreptitious eavesdropper. Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. *The petitioner, in a word, was not relying on the security of the hotel room;* he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing. As counsel for the petitioner himself points out, some of the communications with Partin did not take place in the suite at all, but in the 'hall of the hotel,' in the 'Andrew Jackson Hotel lobby,' and 'at the courthouse.' " (*Ibid.,* pp. 301-302 [385 U.S. 293]. Italics added.)

Finally it is contended that the officers had the right to break into defendant's room because, apart from what they observed, the unobeyed orders he shouted to the lady in the room indicated that narcotics were present and that, unless an immediate entry were made, they would soon "be on their way to the sea." (*People* v. *Verrette,* 224 Cal.App.2d 638, 643 [36 Cal.Rptr. 819].) Unfortunately it is inescapable that the defendant's exhortations were the direct product of the officers' ruse. Had defendant not been confronted with the police officer when he expected a "caller" the words never would have been spoken. The situation is quite analogous to *Wong Sun* v. *United States,* 371 U.S. 471, 484-487 [9 L.Ed.2d 441, 83 S.Ct. 407] : "Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. See *Nueslein* v. *District of Columbia,* 115 F.2d 690 [73 App.D.C. 85]. Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence." (*Ibid.,*

pp. 485-486. See also *People* v. *Bilderbach,* 62 Cal.2d 757, 764 [44 Cal.Rptr. 313, 401 P.2d 921]; cf. *People* v. *Haven,* 59 Cal.2d 713, 718 [31 Cal.Rptr. 47, 381 P.2d 927].)

In case number 299317 the judgment is reversed in its entirety. Since both matters came up for probation and sentence at the same time, before the same judge and since the defendant appears at least technically eligible for probation in case number 291181, the judgment in that case is also reversed but for the sole purpose of enabling the trial court to reconsider the question of punishment. In all other respects it is affirmed.

Hufstedler, J., and Stephens, J., concurred.

A petition for a rehearing was denied March 21, 1967, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied April 19, 1967, and appellant's petition for a hearing by the Supreme Court was denied May 17, 1967. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.