[Crim. No. 14659. Second Dist., Div. Two. Feb. 5, 1968.]

THE PEOPLE, Plaintiff and Appellant, v. ANTONIO MARTIN LOPEZ et al., Defendants and Respondents.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Plaintiff and Appellant.

Stephen I. Zetterberg, and H. George Taylor, under appointments by the Court of Appeal, Zetterberg & George, Lawrence C. George, Richard S. Buckley, Public Defender, Thomas Patterson, John J. Gibbons, and James L. McCormick, Deputy Public Defenders, and Jackson S. Niebrugge for Defendants and Respondents.

HERNDON, J.—Respondents Lopez, Marquez, Rodriguez and Ortega were charged with possession of heroin. At the conclusion of the preliminary examination the magistrate held them to answer. Their subsequent motion to set aside the information under Penal Code section 995 was granted. The People have appealed from this order. We have concluded that the order must be reversed.

The evidence presented to the committing magistrate establishes that one Arthur Marquez was a parolee who had failed to abide by the conditions of his parole. His parole agent, Jack Allen, testified that he had been informed that Arthur Marquez was using narcotics, that by reason of his failure to report as required by the terms of his parole, Marquez had avoided taking the tests required of narcotic parolees designed to detect such violations. Allen therefore determined to take Marquez into custody and had requested the Pomona Police Department to assist him in this effort.

Parole Agent Allen had been informed, as had the Pomona police, that Marquez was residing at the Clayton Motel with one Helen Fayloga. At approximately 10:30 p.m. on the night of July 11, 1967, Agent Allen and four officers from the Pomona Police Department proceeded to the Clayton Motel. The manager of the motel identified a photograph of Arthur Marquez. He advised the officers that he was staying with

Helen Fayloga in a designated apartment; that he had seen Marquez there earlier that day but did not know whether or not he was there at that moment.

The officers also saw in the parking area of the motel a car owned by Arthur Marquez' cousin, the defendant Ruben Chavira Marquez. The officers had seen Arthur and Ruben together in this vehicle on several occasions. The police knew that Fayloga was a name used by defendant Helen Ortega. They were personally acquainted with her and with Ruben Marquez and knew from past experience that both of them had been extensively engaged in traffic in narcotics. When the officers arrived at the apartment occupied by Arthur Marquez and Helen Ortega, Parole Agent Allen and Detectives Oliver and Miller went to the front door. Detectives Traber and McGavock went to the rear of the apartment. Officer Oliver knocked on the front door. When a woman's voice asked who was there, the officer answered, ''The Manager.'' The woman then asked, ''What do you want?'' Officer Oliver replied that it was in relation to a phone call.

At this point defendant Helen Ortega parted the venetian blinds and looked out the window at the officer. He recognized her from their frequent prior contacts and it was evident that she recognized him, for she cried out what sounded like the warning ''Narcos.''

When the officers' true identity became known to the occupants of the apartment, the following described events ensued. Officers Traber and McGavock testified that they had taken their positions at the rear of the apartment to prevent Arthur Marquez from escaping in this direction in the event he attempted so to do. They observed a person they thought to be Arthur Marquez, but who was later identified as his cousin Ruben, attempt to jump through the rear window. As described by Officer McGavock:

''It appeared to be a running motion, and he crashed into the screen coming approximately halfway out of the window, at which time I ordered him to halt. As a matter of fact, I stated 'Halt, police. Stay inside.' ''

After Ruben retreated back into the apartment, the officers heard the sound of more running footsteps and then the sound of ''the lever of the toilet being constantly worked.'' Officer Traber located ''sort of a wash basin'' and standing on it looked into the window from which the sound was emanating. Inside he observed Ruben and defendant Lopez. There

were pieces of paper on the floor and paper within the bowl of the toilet. Lopez was standing over the bowl working the lever of the toilet.

Officer Traber yelled as loudly as he could, "Stop flushing that toilet, get away from that toilet" and, to his fellow officers in front, "Make her open that door." Officer Oliver, who had remained waiting outside the front door throughout this period, heard Officer Traber crying " 'halt' or 'get away' or something like that" and proceeded to force entry. Various illegal items were recovered from the toilet. The several defendants, who were all under the influence of narcotics, were placed under arrest. A search disclosed further contraband and narcotic paraphernalia. The wanted parolee, Arthur Marquez, was absent from the premises but was arrested in some unspecified fashion on the same day.

In granting the motion to set aside the information, the trial court indicated its acceptance of respondents' basic contention that by reason of the failure of the arresting officers to comply with the requirements of section 844 of the Penal Code before entering the apartment, their entry and their subsequent search and seizure of contraband were illegal. In the trial court and in their arguments in this court, respondents have relied mainly upon the decisions in *People* v. *Gastelo*, 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706] ; *People* v. *Rosales*, 68 Cal.2d 299 [66 Cal.Rptr. 1, 437 P.2d 489] ; and *People* v. *Arellano*, 239 Cal.App.2d 389 [48 Cal.Rptr. 686].

For reasons which we shall set out more fully hereinafter, the cited decisions do not support, but rather argue against, respondents' basic contention. In the case at bench, the officers made no entry into the apartment until after their identity had been made known to the occupants[1] and until after the development of exigent circumstances which provided the officers with abundant grounds for their reasonable belief that the occupants were engaged in their partially successful attempts to destroy the evidence.

In approaching the basic question presented by the instant appeal, care must be taken not to confuse the issues involved herein with those arising in two other superficially related, but essentially dissimilar, situations. The instant case is not one in which the officers, *lacking reasonable cause* to enter a private residence *prior to* their use of subterfuge, resorted to

[1] Cf. *People* v. *Limon*, 255 Cal.App.2d 519 [63 Cal.Rptr. 91], and reference thereto in footnote 3 of *People* v. *Rosales, supra*, 68 Cal.2d 299, at page 302.

a ruse *in order to produce additional information* which would then serve to justify a subsequent entry. Neither is the instant case one in which the officers *had reasonable grounds* to enter but thereafter forfeited society's right to rely on the fruits of an ensuing search *by reason of their making a forced entry or an unannounced entry in the absence of exigent circumstances* warranting entry without prior compliance with the requirements of section 844 of the Penal Code.

Contrary to defendants' contentions, decisions such as *People* v. *Reeves,* 61 Cal.2d 268, 273 [38 Cal.Rptr. 1, 391 P.2d 393], and *People* v. *Miller,* 248 Cal.App.2d 731, 736 [56 Cal. Rptr. 865], have no direct applicability here. These decisions hold that *"Unless the officers had reasonable cause to enter [a] room before the door was opened* they cannot lawfully rely on any *information secured by inducing the opening of that door by ruse or subterfuge."* (Italics added.) (*People* v. *Reeves, supra,* p. 273.)

In the instant case, prior to the moment they knocked on the door, the officers had the unquestionable right both to arrest Arthur Marquez and to enter the apartment in which they had reasonable cause to believe he would be found. As pointed out in *People* v. *Quilon,* 245 Cal.App.2d 624, 628 [54 Cal.Rptr. 294] (hearing denied): "Trickery by officers in obtaining entrance to a place where they have no right to be in order to find contraband is unlawful, and in such case the contraband cannot be admitted in evidence. (*People* v. *Reeves,* 61 Cal.2d 268, 273 [38 Cal.Rptr. 1, 391 P.2d 393].) Appellant argues that entry by the federal agents was by a ruse, because the officers hid behind the entry of a privileged caller. But the constitutionally proscribed trickery is that in which an officer obtains entry by subterfuge to a place *where he has no right to be. Stratagem in itself is not illegal; it may be used, for example, to gain entry in order to effect a lawful arrest. (People* v. *Lawrence,* 149 Cal.App.2d 435, 446 [308 P.2d 821]; *Leahy* v. *United States,* 272 F.2d 487, cert. den. 364 U.S. 945 [5 L.Ed.2d 459, 81 S.Ct. 465].)'' (Italics added.) Similarly, the court in *People* v. *Brooks,* 234 Cal.App.2d 662, 679 [44 Cal.Rptr. 661], stated: "In any event, if the suggestion of *Reeves* is followed, and the record is examined to determine whether there was reasonable and probable cause to enter the apartment without a warrant, the conclusion, from the sale which had just been witnessed, is inescapable that there was reasonable and probable cause to arrest the defendant and search the premises in which he was

found. [Citations.] *In such event, the fact the officers might have gained admittance by subterfuge is immaterial.* [Citation.]'' (Italics added.) (See also *People* v. *Scott,* 170 Cal. App.2d 446, 452 [339 P.2d 162].)

As we have previously noted, the holdings in *People v. Rosales, supra,* 68 Cal.2d 299; *People* v. *Gastelo, supra,* 67 Cal.2d 586, and the decision of this court in *People* v. *Arellano, supra,* 239 Cal.App.2d 389, are not controlling here. In each of these cases the police made a forcible, or wholly unannounced, entry into a private residence, the occupants of which were unaware of the officer's identity or purpose. In none of these cases did the prosecution make an adequate showing of the existence of exigent circumstances justifying unannounced or forcible entry. These decisions indicate California's recognition that ''Section 844 is designed to protect fundamental rights. 'Decisions in both the federal and state courts have recognized, as did the English courts, that the requirement is of the essence of the substantive protections which safeguard individual liberty.' (*Ker* v. *California* (1962) 374 U.S. 23, 49 [10 L.Ed.2d 726, 747, 83 S.Ct. 1623], Brennan, J. dissenting.)'' (*People* v. *Rosales, supra,* 68 Cal.2d 299, 304.)

This well understood rule is founded upon two basic considerations relating to the practical hazards of law enforcement. As Justice Brennan further stated in *Ker* v. *California,* 374 U.S. 23, 57-58 [10 L.Ed.2d 726, 752-753, 83 S.Ct. 1623] : ''First, cases of mistaken identity are surely not novel in the investigation of crime. The possibility is very real that the police may be misinformed as to the name or address of a suspect, or as to other material information. That possibility is itself a good reason for holding a tight rein against judicial approval of *unannounced* police *entries* into private homes. Innocent citizens should not suffer the shock, fright or embarrassment attendant upon an *unannounced* police *intrusion.* Second, the requirement *of awareness* also serves to minimize the hazards of the officers' dangerous calling. We expressly recognized in *Miller* v. *United States, supra* (357 U.S. at p. 313, footnote 12 [2 L.Ed.2d at p. 1340, 78 S.Ct. 1190]), that compliance with the federal notice statute 'is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder.' Indeed, one of the principal objectives of the English requirement of announcement of authority and purpose was to protect the

arresting officers from being shot as trespassers, '. . . for if no previous demand is made, how is it possible for a party to know what the object of the person breaking open the door may be? He has a right to consider it as an aggression on his private property, which he will be justified in resisting to the utmost.' *Launock* v. *Brown,* 2 B & Ald 592, 594, 106 Eng Rep 482, 483 (1819).'' (Italics added.)

Because of these underlying considerations, certain logical exceptions to the rule always have been equally well recognized. ▊ As observed by Justice Brennan (*Ker* v. *California, supra,* 374 U.S. at p. 47 [10 L.Ed.2d at p. 746]): ''Even if probable cause exists for the arrest of a person within, the Fourth Amendment is violated by an unannounced police intrusion into a private home, with or without an arrest warrant, except (1) where the persons within already know of the officers' authority and purpose, or (2) where the officers are justified in the belief that persons within are in imminent peril of bodily harm, *or (3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted.*'' (Italics added.) The instant case falls squarely within the emphasized exception. (Cf. also *People* v. *Rosales, supra,* 68 Cal.2d 299, 302, fn. 3.)

▊ The spectacle of Ruben Marquez leaping through a screened window when the identity of the police was announced, albeit from the lips of Helen Ortega rather than by the officers themselves, supplied ample independent basis for *his* arrest.[2] (Cf. *People* v. *Garavito,* 65 Cal.2d 761, 764 [56 Cal.Rptr. 289, 423 P.2d 217].) ▊ Furthermore, in view of the failure of Arthur Marquez to comply with the testing requirements of his parole, the known narcotic activities of Helen Ortega with whom he was residing and those of his cousin Ruben with whom he was associating, and whose care was parked outside the residence, and the abnormal use of the toilet facilities were sufficient to justify the observations made by the officers and the conclusion reached that the defendants herein were then engaged in the commission of a felony, i.e., possession of narcotics, and were attempting to dispose of the

---

[2]It may also be noted that if the police had arrested Ruben under the reasonable but mistaken belief that he was the wanted Arthur Marquez, a search incident thereto would have been proper despite this error as to identity. (Cf. *People* v. *Hill,* 69 Cal.2d 550, 554 et seq. [72 Cal.Rptr. 641, 446 P.2d 521].)

evidence thereof. (Cf. *People* v. *Carrillo,* 64 Cal.2d 387, 392 [50 Cal.Rptr. 185, 412 P.2d 377].)

■ The contention that Officer Oliver nevertheless should have complied with the formalities of Penal Code section 844 before responding to the cries of his fellow officers, *who theretofore had already explicitly confirmed what Helen Ortega had observed,* i.e., that they were police officers, is patently frivolous. "Such quixotisms of police procedure befit a Gilbert and Sullivan operetta libretto, not the serious business of real-life police investigation." (*People* v. *Koelzer,* 222 Cal.App.2d 20, 28 [34 Cal.Rptr. 718].)

■ Finally, there remains respondents' contention that if the officers had complied with section 844 and announced the purpose of their visit, it is possible that they might voluntarily have allowed the officers to enter the apartment to look for Arthur Marquez despite the fact that they were all subject to immediate arrest by reason of their being under the influence of narcotics.

Since the officers could not have been denied admittance in any event, it is apparent that insofar as the instant criminal charges are concerned, respondent's suffered no prejudice by reason of the officers' failure to comply with this section. Moreover, the subsidiary argument that the use of a ruse, with its attendant risk of exposure, might violate the constitutional rights of innocent parties by causing them to react as did respondents herein is manifestly absurd. The fact that respondents possibly may have assumed that the primary reason for the officers' presence was to arrest them rather than the parole violator, Arthur Marquez, only proves the lasting verity of the biblical observation that "The wicked flee when no man pursueth." (Proverbs 28:1.)

The order is reversed.

Roth, P. J., concurred.

FLEMING, J. Concurring.—In the absence of exigent circumstances the use of a ruse to obtain entry to premises to make an arrest does not satisfy the requirements of Penal Code, section 844, that a peace officer first demand admittance and explain his purpose, and I would so hold in this case. (*People* v. *Rosales,* 68 Cal.2d 299 [66 Cal.Rptr. 1, 437 P.2d 489]; cf. *Miller* v. *United States,* 357 U.S. 301 [2 L.Ed.2d 1332, 78 S.Ct. 1190].) But here the ruse failed to achieve its purpose, and its effect was entirely dissipated when those

inside, without yielding entry, discovered the true identity of their visitors. The subsequent reactions of the insiders to this discovery created circumstances sufficiently exigent to justify prompt forcible entry without further demand or explanation.

Petitions for a rehearing were denied February 26, 1969, and the petitions of respondents Lopez, Marquez and Rodriguez for a hearing by the Supreme Court were denied April 2, 1969.