[Civ. No. 12785. Third Dist. Apr. 27, 1971.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
RONALD G. MANFREDO et al., Real Parties in Interest.

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Daniel J. Kremer and Nelson P. Kempsky, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Milton L. Baldwin, Marco Zarick, Harry J. Englebright and Thomas C. Williams for Real Parties in Interest.

## OPINION

**PIERCE, P. J.**—Real parties in interest were charged with violation of Health and Safety Code section 11500.5 (possession of heroin for sale) with a prior felony conviction charged against each defendant. After pleas of not guilty and denials of the prior convictions, motions to dismiss the information (under Pen. Code, § 995) were denied. On a motion to suppress evidence under Penal Code section 1538.5 the superior court ordered suppression of certain items seized. The People seek a writ of mandate.

Of the evidence suppressed, a funnel, a knife, a plastic bag containing four measuring spoons and a box of empty balloons were the contents of an open shopping bag. The bag was in a hotel room. Evidence of the items found in the bag was suppressed under the trial court's belief that search thereof fell within the proscriptions of *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]. Other evidence seized which had been in full view and taken from a dresser in the hotel room was suppressed as having been obtained as the result of violation of Penal Code section 844. We hold that the search and seizure of all evidence involved violated neither the *Chimel* rule nor the provisions of the code section and will grant a peremptory writ of mandate as prayed for.

### FACTS

On June 24, 1970, Officer Cozzalio, who for many years had been and was at the time of the events involved in this matter, field supervisor for the

Bureau of Narcotics Enforcement, received information from an undisclosed source that Bay Area people were selling heroin in Sacramento. One location specified was Capitol Park. Two persons were described: both of Italian descent, one with a receding hair line, the other bruised and beaten up as if he had recently been in a fight. One was believed to be a parolee.

The following day, Cozzalio, with two other officers, went to Capitol Park and into the Capitol where they stationed themselves just inside the east entrance. Outside about 50 yards from the point where the officers were standing they saw two men. One was a person whom Cozzalio recognized to be a user of narcotics. The other, although the officer could not be sure, may have had characteristics of a person of Italian descent. The two men were watched for five minutes as they talked, after which they parted and walked away. Cozzalio followed the "known" user of narcotics. The other two officers followed the second man. These events occurred at about 6:20 p.m.

The sole prosecution witness to the foregoing and subsequent events was Officer Cozzalio. There is no testimony regarding that which occurred when he followed the "known" user. We pick up the story again when Cozzalio returned to the office of the Bureau of Narcotics Enforcement a short time later and was told by his fellow officers that the man they had followed had gone into the Berry Hotel. With those officers Cozzalio went to that hotel where they questioned the desk clerk. They described the man they were seeking as best they could. From several possibilities they elected to interview one of two occupants of room 505 who was thought to be in his room. Registration was in the name of "Ronald Manfredo and one." They went to the room. (Cozzalio testified the purpose of the officers had not been to arrest anyone or to search the room.) The record shows that Cozzalio had taken a key to room 505 with him. It was not used, however, and the trial court indicated in ruling on the motion that it believed Officer Cozzalio's testimony. According to that testimony the purpose of the officers in visiting the room's occupant was to question him (presumably with the latter's permission) regarding the information previously received from the undisclosed source about narcotics activities being carried on in Capitol Park; also about the room occupant's status as a parolee. When Cozzalio arrived at room 505 he knocked loudly. At first there was no response. A sufficient period of time elapsed that the officer thought no one "was going to answer. I knocked probably three times real loud." Then a man, later identified as Manfredo, did answer and opened the door fully. Cozzalio identified himself as a police officer and showed his badge. With the door thus widely opened Cozzalio could see not only Manfredo, but a number of the items in the room, including one bed and part of another.

Manfredo was wearing either a T-shirt or a shirt with short sleeves or with sleeves rolled up so that Cozzalio could observe Manfredo's forearm. The officer saw blood trickling down Manfredo's arm. He also observed that his eyes were glassy and pinpointed. "He seemed to be in a stupor . . . didn't seem to be all there. He just wasn't reacting fast." Then Cozzalio observed what appeared to be needle marks, "old tracks." The prosecutor qualified Officer Cozzalio as an expert and elicited the opinion that Manfredo was under the influence of narcotics. By reason of these facts and this conclusion Cozzalio determined to arrest Manfredo under Health and Safety Code section 11721 (being under the influence of narcotics). Cozzalio then stepped into the room. From that vantage point he was able to see a dresser. On top of the dresser plainly in sight were a glass containing narcotic paraphernalia, a hypodermic needle attached to it, some balloons that were empty, some that were filled with a powdery substance and some narcotics packaging material; also spoons that had been burned. The material in the filled balloons was apparently, but not here proven to be, heroin. Thereupon, Officer Cozzalio spotted an open shopping bag at the foot of one of the two beds. Observed in it were the items which we have, at the outset of this opinion, described. Cozzalio then placed Manfredo under arrest for possession of narcotics for sale.

Defendant Signorelli was arrested in the hotel room at a later time on the same evening. Signorelli had not been in the room on the first visit to the room at the time Manfredo was arrested. He apparently walked in later and after having been identified as a co-occupant of the room was arrested. He was the beaten-up person with lacerations who had been described by the informant as one of the men who would be trafficking in narcotics. (In these proceedings we are not interested in either the sufficiency of the evidence to tie Signorelli into the crime charged nor relevancy of the evidence seized to establish his guilt.)

### EXCLUSION OF EVIDENCE UNDER THE CHIMEL RULE

As stated above, the court suppressed the contents of the shopping bag, basing its ruling upon *Chimel* v. *California, supra,* 395 U.S. 752 [23 L. Ed.2d 685]. There a warrant for the arrest of Chimel had been issued for burglary of a coin shop. No search warrant had been issued to search his home. The validity of the arrest warrant was not challenged. During Chimel's absence the officers were admitted to his home by Mrs. Chimel and awaited his arrival. He was then arrested when he entered the house. The officers then made, over Chimel's objection, a thorough search of the whole house, including its attic. Mrs. Chimel was told to and did open

drawers. The search lasted from 45 minutes to an hour. Stolen goods were recovered.

It was held by a majority of the court that the search was invalid because it had gone "beyond the area from which the person arrested might obtain weapons or evidentiary items. The only reasoned distinction [between cases pro and con] is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other." (*Id.*, at p. 766 [23 L.Ed.2d at pp. 695-696].)

The reasoning of *Chimel* first of all has a background of facts where officers who had obtained an arrest warrant might (apparently) at the same time have obtained a warrant to search his home since that is where they were going to arrest him, but they did not do so. In that situation they should not be given the opportunity to engage in searches "by the simple expedient of arranging to arrest suspects at home rather than elsewhere." (*Id.*, at p. 767 [23 L.Ed.2d at p. 696].) The court points out that had Chimel been arrested, e.g., at his place of employment, no search-warrantless search of *any* part of his home could have been justified. It is, the court reasons—borrowing from the aphorism of Judge Learned Hand (in *United States* v. *Kirschenblatt*, 16 F.2d 202)—difficult to hypothesize a set of circumstances under which "one's papers are safe [from search] only so long as one is not at home." (*Id.*, pp. 767-768 [23 L.Ed.2d at p. 696].)

The rule of *Chimel* (like most rules) must be applied in the context of its facts. Those facts are quite different from the facts of the case at bench where the officer, Cozzalio, had not called upon Manfredo at his hotel room to arrest him. This was a visit in the course of an investigation. Cozzalio had no arrest warrant nor probable cause to obtain one. Nor was there any probable cause to make a warrantless arrest. Had Manfredo refused to open the door to the hotel room when Cozzalio knocked on the door, he would have been within his rights. Had Cozzalio used the key to room 505 to gain access thereto, there would have been an illegal entry. The trial court in its ruling indicated that it believed Officer Cozzalio's story (see *People* v. *Superior Court* (1968) 261 Cal.App.2d 687, 688 [68 Cal.Rptr. 281]) but thought the entry and the search were nevertheless illegal.[1]

---

[1]That the judge in this matter *did* believe Cozzalio and, nevertheless, thought the arrest and search to be illegal is evidenced by the following excerpts from the transcript where the court said: "That then brings us to the consideration of the question of whether the officer was properly in the room, and that in my judgment has to turn upon what happened at the door, and, as modified . . . by the knowledge . . . which the officer had beforehand.

". . . I feel this situation is governed by the knock and notice statute. . . ."

Earlier the court had observed: "In my judgment the material inside the shopping bag is no different than the material that would be inside a dresser drawer or inside

■ Officer Cozzalio, however, did not make an illegal entry. Manfredo, responding to the officer's knock, opened the hotel room door and opened it wide standing obligingly in the doorway. Cozzalio, an expert, observed a man exhibiting all the classic symptoms of one who had recently injected heroin and who had perhaps been in the process of continuing that activity when interrupted by the knock on the door; his eyes were pinpointed and glassy, he was in a stupor, and most importantly blood was trickling from a wound where narcotics are usually injected by a user. In short, he was in the course of committing a crime.

■ Up to that point Cozzalio and the other officers were not making an arrest; they were carrying on an investigation in a manner within both their powers and their duties as law enforcement officers. (*People* v. *Berutko* (1969) 71 Cal.2d 84, 90 [77 Cal.Rptr. 217, 453 P.2d 721]; *People* v. *Peterson* (1970) 9 Cal.App.3d 627, 632 [88 Cal.Rptr. 597]; *People* v. *Boone* (1969) 2 Cal.App.3d 66, 69 [82 Cal.Rptr. 398]; *People* v. *Superior Court* (1968) 261 Cal.App.2d 687, 689 [68 Cal.Rptr. 281] (hg. den.).) It was within their powers and duties as police officers to investigate because of the tip regarding narcotics activities at Capitol Park, because of Cozzalio's recognition of one of the participants in the park conversation as a narcotics user, and because surveilliance of one of the men had placed him at the Hotel Berry and, with the aid of the hotel clerk, in room 505. A man's hotel room is his castle, but neither his hotel room, his home, nor his castle is, under the Fourth Amendment, or any other law, a place to which law enforcement officers may not go and seek to question within the scope of proper inquiry a person believed to have information concerning the subject of that inquiry. We, therefore, have the officers properly at the door and properly knocking at that door.

■ At the point when the door was opened, there was then a proper entry. As has been shown, Manfredo was observed committing a crime. No constitutional guarantee or law says that the stupid or stupified act of a hotel room occupant who opens the door of his room may not be observed; nor are the officers then chivalrously compelled to turn their backs upon what they see if it constitutes a crime. On the contrary, they then have legal right to make an arrest. (*Mann* v. *Superior Court* (1970) 3 Cal.3d 1, 7 [88 Cal.Rptr. 380, 472 P.2d 468]; *People* v. *Berutko, supra,* 71 Cal.2d 84, 93; *People* v. *Garavito* (1967) 65 Cal.2d 761, 764 [56 Cal.Rptr. 289, 423 P.2d 217]; *People* v. *Peterson, supra,* 9 Cal.App.3d 627, 633; *People*

---

a closed cupboard or in another room of the house. It could not be observed in plain sight. . . . He would have to specifically go over to the bag and look inside of it. . . . I would feel that the United States Supreme Court's ruling in the *Chimel* case would invalidate that search."

v. *Boone, supra*, 2 Cal.App.3d 66, 69; *People* v. *Superior Court, supra*, 261 Cal.App.2d 687, 689.

■ To arrest Manfredo Officer Cozzalio had to step into the room. Once in the room neither he nor the other officers were required to ignore that which was in sight. (See cases cited *infra*.) On the top of the dresser within plain sight was narcotics paraphernalia. Also there was a "powdery substance" assumed to be heroin.[2] The shopping bag which was open was by one of the beds in the room. The quantity of the substance which we assume to be heroin and the manner in which it was packaged caused the officer to believe that it was held for sale. Manfredo was properly arrested for that offense. (*People* v. *Campuzano* (1967) 254 Cal.App.2d 52, 55 [61 Cal.Rptr. 695] (hg. den.).) Cozzalio examined and seized the contents of the open shopping bag. The items it contained have already been described.

*Chimel* permits a search of the area within defendant's immediate control, i.e., the area within which he has ready access to weapons or evidence. Officer Cozzalio's description of this hotel room demonstrated that the area searched was well within the limitations of *Chimel*. The fact that the shopping bag was open is an immaterial factor. It would have been just as subject to search had it been closed.

Under the circumstances of this case to insist that the officers were required to forebear examining the contents of the shopping bag until they had sought out a magistrate would be to carry the "unreasonable search and seizure" guarantee of the Fourth Amendment far beyond the intent of *Chimel* or the founding fathers.

### PENAL CODE SECTION 844 IS INAPPLICABLE

■ The code section cited in the caption states that "To make an arrest" an officer may break open a door and enter only "after having demanded admittance and explained the purpose for which admittance is desired." The foregoing opinion has missed its purpose if it has not shown that when the officers here knocked to question the occupant of room 505, they did not do so to make an arrest but as part of a proper investigation. When the door was opened by a stupefied Manfredo, then in the process of committing a crime, the entry by the officers into the room to arrest him was valid

---

[2]It has not yet been proved that this "powdery substance" *was* heroin. Before it can be determined finally that this powdery matter *was* heroin and thus relevant evidence on the charge of possession of heroin for purpose of sale, such proof must be made. The court, however, by its anticipatory ruling had made it impossible or futile for the prosecution to offer such proof. The fact that it was heroin seems to have been assumed by everyone. Absence of such proof should not be a determinative factor on these proceedings.

without question. To argue that such officers must first close the door, knock on it again, identify themselves again, explain their purpose and then break open the door is to argue an absurdity. Of the cases cited above the following will suffice: *People* v. *Berutko, supra,* 71 Cal.2d 84, states at page 93: " 'What a person exposes knowingly to the public, even in his own home . . . is not a subject of Fourth Amendment protection.' " (See also *People* v. *Peterson, supra,* 9 Cal.App.3d 627, 631; also *People* v. *Boone, supra,* 2 Cal.App.3d 66, where the court says at page 69: "It would run counter to common sense to hold that in this situation [not dissimilar to the facts here], the officer would have to re-knock on the door and stop to tell defendant Boone why he was coming in and to step aside.")

Let a peremptory writ of mandate issue directing the trial court to vacate its order suppressing evidence.

Friedman, J., and Janes, J., concurred.

The petition of real party in interest Signorelli for a hearing by the Supreme Court was denied June 23, 1971.