[Crim. No. 2643.   Third Dist.   June 8, 1956.]

THE PEOPLE, Respondent, v. FRANK JENNINGS, Appellant.

J. Everett Barr and Gerald L. Shannon for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and J. M. Sanderson, Deputy Attorneys General, for Respondent.

VAN DYKE, P. J.—Appellant herein was charged by information with the crime of assault with a deadly weapon with intent to commit murder. He was tried to a jury and found guilty of the included offense of assault with a deadly weapon. The following is a sufficient statement of facts to enable us to consider the assignments of error. We have stated them most favorably in support of the judgment, as we must on appeal.

About 10 p. m. on March 15, 1955, in the small town of Dorris, California, one Manley M. Gravier, commonly known as "Jack," was awakened by a knock on the door of the trailer house in which he resided. He arose, picked up a flashlight and opened the door. As he did so, a voice said, "Jack Gravier." Gravier shone the light toward the sound of the voice and answered, "Yes." At the same time he saw appellant pointing a shotgun at him. As the light struck appellant's face, he lowered his face to the stock of the shotgun. Gravier ducked to his left. Appellant fired, the charge striking Gravier in the right shoulder, tearing away the deltoid muscle. The force of the blast spun Gravier to his right and back and he reached for his gun which lay close at hand on a shelf. He ran outside in time to see a pickup with a red top being driven away. He saw a shotgun lying in the snow near his trailer. He went back into the trailer house and called the chief of police, one Byard Kelly. Kelly's wife answered the phone. Gravier then went next door to the home of Ted Wright, the assistant chief of police of Dorris. By that time Mrs. Wright, who with several others had heard the sound of the shot, was investigating to determine the source of the noise. Gravier told Mrs. Wright he had been shot, and she took him to the hospital in her car. Mrs. Wright and Mrs. Kelly returned to the scene of the shooting and found a sawed-off shotgun lying about 7 feet from the door of the trailer. A little over an hour later, appellant was stopped and arrested at a road block

approximately 62 miles from the scene of the shooting. He was then driving a red and black Dodge pickup and was wearing clothing similar to that which Gravier had observed being worn by his assailant. Several other witnesses testified they had seen a red and black pickup in the general area where the shooting took place, either shortly before or after the shooting occurred. Three days after the shooting a short piece of shotgun barrel was found 22 yards away from a garage which was used by appellant and which was three houses away from appellant's house in Dunsmuir. The shotgun found outside Gravier's house trailer and the short piece of barrel were both submitted to the State Bureau of Criminal Identification for examination, and an expert from the bureau testified that the shotgun and the piece of barrel had been at one time joined together to form one shotgun barrel. The expert testified that in his opinion the short piece of barrel had been detached from the gun by being sawed off with a hack saw. On March 16th, a search of appellant's house revealed a hack saw with fresh metal particles in its teeth. Gravier positively identified appellant, whom he knew, as being the man who shot him. Defendant did not, during the trial, take the stand in his own behalf.

Appellant contends that the trial court erred in prohibiting him from showing by cross-examination of Gravier and in other ways that Gravier bore ill will toward appellant's minor daughters. He had been permitted to show that Gravier bore ill will toward the appellant to the extent that on one occasion he had said that if appellant continued to interfere with the association between Gravier and appellant's ex-wife, Gravier would kill him. Such evidence, of course, went to the credibility of Gravier, who was the only witness who had identified appellant as having fired the shot at Gravier. But the trial court refused to permit appellant, on cross-examination of Gravier and of appellant's daughter, to show that Gravier also possessed ill will toward the children. This ruling was within the discretion of the trial court in limiting cross-examination. It is difficult to see how ill will toward the minor children would have stood as impeachment against Gravier. There might be cases, of course, where such testimony would have an impeaching value, but in this case it appears from the record that if it had any value whatever, it could only have been very slight and error cannot be predicated upon the court's refusal to go into matters

which would have involved inquiries collateral to the case being tried. While no California case directly on this point has been found, a direct ruling contrary to appellant's contentions was made in *Wimberly* v. *State*, 95 Tex.Crim.Rep. 102 [252 S.W. 787, 790], where the court said:

". . . Before we would reverse a case for the rejection of evidence supposed to show animus or evil motive on the part of a state witness, such evidence must in some way indicate appellant as the object of the dislike or prejudice of the witness. That one had had a fight with relatives of the accused against whom such party testified, would not show animus on his part against the party on trial."

Karleen Jennings, a daughter of appellant, aged about 15 at the time of trial, was called on behalf of appellant. Apparently the purpose of calling her was to establish that the witness Gravier bore ill will toward defendant. In the course of her testimony, she was asked to fix the time when an incident of ill will had occurred. She replied as follows: "It was before he was jerking me around that day." The court observed that the answer was not responsive, but at that time no motion to strike was made. The witness proceeded to fix the date and testified as before stated that on that occasion Gravier had threatened to kill appellant. After the close of evidence and after counsel for the People had made the opening argument, counsel for appellant addressed the jury as follows: "I think we ought to clear up one thing right away, and I think I will take that up before we discuss anything else . . . the District Attorney intimates, apparently, that Mr. Gravier was shot in the line of duty. ▮ The only antecedent matter that we have, showing twice, in the company of Mrs. Jennings, and once, in roughing up the little Karleen Jennings, according to her testimony." At that point counsel for the People objected there was no such testimony and an argument ensued concerning it. The reporter's notes were referred to, and counsel for appellant asked that the testimony be read directly to the jury. Again the court observed that the statement had not been responsive to a question. Counsel replied that it had not been stricken. Thereupon, counsel for the People moved to strike and the motion was granted. Counsel for appellant cited the act of the court in striking the testimony after the close of evidence as prejudicial misconduct, and he urges the same contention here. It is, of course, unusual to strike testimony

after the close of evidence and during argument to the jury. But here the record shows that the type of evidence which was stricken had, before it crept into the record by a non-responsive answer to a question, been explicitly ruled by the court to be inadmissible; that is, the court had ruled out testimony as to the ill will of Gravier toward appellant's children. It is fair to assume from the record that the testimony which came in was one of the incidents of ill will which counsel for appellant had unsuccessfully sought to prove before. We have already said that the exclusion of such testimony was not error and we think that when the court struck it out in line with its previous rulings, it acted within its discretion.

It was asserted by counsel for appellant during trial that prior to the commission of the crime appellant had complained to the sheriff of the county about antagonistic conduct of Gravier toward him. Appellant sought to prove this as part of his showing that Gravier was biased toward him. He first attempted to show it on cross-examination of Gravier. An objection was made that the question assumed matters that had not been proved. The court suggested that he ought first to prove that the incident occurred and that the sheriff's testimony would be admissible for that purpose. (It may be said also that appellant himself could have so testified.) Appellant complains of the court's refusal to grant a continuance to permit him to obtain the testimony of the sheriff. The sheriff had been on the stand as a witness, and on cross-examination was asked if the time when he arrested appellant was the first time he had ever seen him. He had said that it was. He was then asked if appellant had not once visited him regarding a complaint about Gravier. An objection was sustained to the question. The matter was dropped at that point and both sides excused the sheriff from further attendance on the trial. ▆ At the close of evidence, counsel for appellant asked for a continuance until the sheriff would return. The court replied the case could not be delayed another day for that purpose inasmuch as counsel had excused the sheriff from further attendance. Counsel asserted that the matter of the complaint to the sheriff had been ruled out when the sheriff had been on the stand. The court said that no offer of proof as to what the complaint was had been made at that time. On the following day before the case went to the jury, counsel for appellant made a further effort

for a continuance to obtain the sheriff's testimony. He made a showing of his diligence in attempting to reach the sheriff over night and also made an offer of proof. Further continuance, however, to obtain the attendance of the sheriff was denied. We think error cannot be predicated upon the foregoing. It had been well established that the two men were not friendly, in fact, that on one occasion Mr. Gravier had threatened to kill Jennings; that he bore ill will toward appellant was sufficiently shown. The matter that was to be shown by the sheriff's testimony, that is, the matter of the complaint as to Gravier's conduct toward appellant's daughter would have been cumulative at the best. A trial court must be allowed considerable discretion as to continuances for the purpose of producing cumulative testimony.

Appellant contends that the court committed error in excluding evidence of instructions given to the dispatcher of the highway patrol that they were to search for a blue pickup automobile rather than a red one. There had been testimony that a red or a red and black pickup had been seen in the vicinity of the crime and Gravier had testified that he had seen such a car being driven away. When arrested, appellant was driving a red and black pickup. Appellant called a dispatcher to the stand and asked her if she had received a message from the sheriff's office concerning the search for the man who had shot Gravier. The witness testified she had received such a message, that she had made notes of what she had been requested to broadcast which had been later entered in a desk log. The book was handed to her and she was asked to read her entries concerning what the message had been. When she had done so, she was asked what type of truck the officers had been told to intercept. An objection to the question was sustained. Appellant's counsel argued to the court that he was attempting to show by the highway patrol's records that for an hour their instructions had consistently been to look for a blue pickup, and he offered to prove from the record that some unidentified person had phoned the dispatcher, requesting that the highway patrol be alerted to intercept a blue pickup. Said the court: "If you can put the person that made that statement on the stand and ask the question if he made such statement, and he denies it, I have to admit it . . . MR. BARR: I would have to call him as a hostile witness. THE COURT: That makes no difference." We do not see how proof that some unidenti-

fied person had called the dispatcher and asked that the patrol be alerted to intercept a blue pickup could have had any bearing upon the questions at issue in this case, save only if that person had been a witness who had testified, in chief, that the car seen in and about the scene of the shooting and leaving the scene of the shooting had been a red pickup. In short, as the court said, it was a matter of impeachment and until and unless evidence was given that a witness so testifying was the one who had called and asked that the patrol be instructed to intercept a blue pickup, proof that such a call had come in from someone was inadmissible. Evidently, counsel knew whom he charged with having made the call to the patrol but objected to calling that person because of the witness' hostility. This did not make the proffered evidence admissible. After the foregoing ruling had been made and later on during the trial, counsel for appellant had the highway patrol records produced in court. He sought to introduce them as proof that the officers had been searching for a man driving a blue pickup because information had come into the office that whoever fired the shot at Gravier had been driving such a vehicle. Again it was pointed out to him by the court that, except as in impeachment of some witness, the facts were immaterial. We think the court was right. We are unable to see, even assuming that someone had informed the sheriff's office that the person seen leaving the scene of the crime had been driving a blue pickup that such proof could have been material except by way of impeachment, and that would be so only in case that person was shown to have been a witness who had testified contrary to the information he had later passed on to the officers. Although there was some discussion about whether or not the official files could be introduced in evidence because they were confidential files, we think it unnecessary to discuss that matter since they were in any event inadmissible.

An officer testified during the trial that he had found a hack saw in the basement of appellant's home. This hack saw was introduced in evidence and an expert witness testified that it could have been the one which had been used to saw off the barrel of the shotgun left at the scene of the shooting and that it had fresh metal filings in its teeth when examined. Appellant objects that the receipt of this evidence as to the hack saw and its introduction in evidence as an exhibit was error because the officer who found it had had no warrant

to search appellant's home. At the time the officers went to appellant's home, the appellant had been arrested and was in jail. The officers went to his home about 3:30 in the morning. The appellant's daughters were there; one was 15, one was 17. They questioned the girls for a long time. A police matron had accompanied the officers. The officer testified the two girls had admitted them, and that, in the course of their questioning of the girls, the elder girl accompanied an officer to the basement where the hack saw was found. The girls knew that their father had been arrested and was in jail. The search of the basement and the discovery of the hack saw occurred at 8:40 a. m. Before the hack saw was introduced in evidence, counsel for appellant established that the search had been made without a warrant and objected that the evidence was inadmissible, having been unlawfully obtained. The officer testified that he had found the hack saw on a work bench in the basement of appellant's home. It was introduced in evidence. On cross-examination the officer testified that when he went to appellant's residence it was occupied by the two girls. Motion was thereupon made to strike his testimony concerning his search and his finding of the hack saw from the record and to admonish the jury to disregard it. Counsel further assigned the introduction of the hack saw as prejudicial misconduct. Thereupon, in an apparent attempt to show consent, the prosecuting attorney asked the officer if he had talked to anyone at the appellant's residence. The officer said he had; that he had approached the front door and was admitted by the two daughters; that he had the police matron with him; that they talked to the girls, and "Shirley Jennings accompanied me on the search, she was with me at the time"; that they sat in the front room and talked with the girls and told them their father was in jail; that the girls had not been to bed; that in fact they were interrogated until five that evening. He said that no one except the two girls had given him permission to enter the house.

To begin with, there appears to be not the slightest reason or excuse for the failure of the officers to obtain a search warrant. To get a search warrant is a simple matter and requires little time. When, under the circumstances shown here, a search is made without a warrant, the burden is upon the prosecution, if it seeks to use evidence thus obtained. to show proper justification. (*Badillo* v. *Superior Court*, 46

Cal.2d 269, 272 [294 P.2d 23].) ▓ Respondent here contends that consent was shown. We think not. The consent, of course, must be that of the man whose house is searched or that of someone able to speak for him. It is mere pretense under the circumstances shown here to claim that the two minor daughters could give or had given consent to the search of their father's residence. It is idle to suppose that they would have in any way interfered with the police officer searching the house. They knew their father had been arrested, was in jail and charged with a serious crime. They had been questioned for hours before the search was made. There is no showing whatsoever that consent was even asked. What is shown is that after hours of questioning the officer simply searched the house, and the fact that he was accompanied by the older girl proves nothing in the way of consent. Respondent argues further that the use of the hack saw in evidence, and the testimony as to its condition and the place where it was found could not be prejudicial even if erroneous. Respondent says: "The hack saw was only a small bit of circumstantial evidence of appellant's guilt, and in view of the other overwhelming evidence of his guilt, could not have affected the result of the trial." It is strange that if the prosecuting attorney viewed the circumstantial evidence of the hack saw and its discovery as merely a small bit of circumstantial evidence, he would have run the risk of a reversal of a conviction by using it at all. As a matter of fact, the hack saw was a material link in the chain of circumstantial evidence. A fair inference from its being found where it was, when it was, and in the condition it was when found, is that the appellant himself had used the instrument to saw the shotgun in two, which gun in turn had been used to shoot Gravier. It was all a part of the proof of planning and premeditation and of intent to kill.

▓ Nevertheless, on the whole record here we have concluded that the judgment appealed from ought not to be reversed because of the error in receiving the hack saw in evidence and in admitting the testimony concerning it. We have the positive testimony of Gravier that appellant shot him; the fact that Gravier was well placed to identify him and knew him well; that he was able then to describe in fair detail the clothes appellant was wearing when intercepted; we have Gravier and other witnesses' testimony as to the pickup truck leaving just after the shooting; we have appellant intercepted wearing such clothes and in such a truck

62 miles away within an hour and fifteen minutes after the shooting; we have the fact the shotgun barrel was freshly sawed off and the part sawed off found near a garage used by appellant and within a few doors of appellant's home; and we have the fact that appellant declined to take the stand and explain, if he could, the incriminating evidence against him. We do not believe that if the hack saw and the testimony about it had not been received in evidence the result would have been the acquittal of appellant.

■ Shirley, the elder daughter of appellant, a witness for the People, testified that on March 14th she looked in her father's pickup, searching for a lost compact. She looked behind the seat and there saw a gun. When shown the gun with which Gravier had been shot, she said she did not think the one she saw in the pickup was the same. She said she had never seen the gun in the pickup before. On cross-examination she was asked who she had told about the gun and replied it had been Officer Banich; that he had been questioning her for quite some time. She was then asked, "How long in hours?" Objection was made and sustained that the question constituted improper cross-examination. Thereafter, counsel for appellant, addressing the court in the absence of the jury, offered to prove by Shirley that the first time she ever told anyone about this gun was when she told the sheriff's office after she had been continually interrogated for 14 hours. He argued that she was a young girl (she was 17) and that in common with those of her age group would be susceptible to implanting of testimony in her mind. The proffered proof was rejected. We find no error in this ruling. The trial was held long after the questioning had been done; she had ample time to recover from any oppression by the officer if such occurred, and when she testified at the trial that she saw the gun, it would have been purely conjectural to have assumed that she still was under such influence, that she was not then telling the truth.

Appellant did not take the stand as a witness in his own behalf. The trial court gave the usual instructions as to its being the constitutional right of a defendant to abstain from testifying if he wished to do so. The court told the jury, however, that if he did not testify they could take that fact into consideration as tending to indicate the truth of such evidence as he had neither denied nor explained and as indicating that it might be reasonably inferred that among the inferences which could be reasonably drawn from his failure

to explain or deny, inferences unfavorable to the defendant were the more probable. The court told the jury that in deciding whether or not to testify, the defendant could choose to rely on the state of the evidence and upon the failure, if any, of the People to prove every essential element of the charge against him; and that no lack of testimony on his part would supply a failure of proof by the People. Defendant proposed and the court refused to give a further instruction that if a defendant did not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to so deny or explain.

We think the court fully and fairly instructed the jury on the subject of defendant's choice of remaining off the witness stand, and that it was unnecessary to give the instruction proposed and refused. By its nature it is merely argumentative and tells the jury nothing that they would not know without the instruction being given.

Just before the case went to the jury and in the absence of the jury, counsel for appellant moved the court to declare a mistrial because of alleged prejudicial misconduct on the part of the officers in that immediately after the close of the evidence and while people were still in the court and about the court room, they had misconducted themselves toward the appellant. In support of the motion appellant testified that after the adjournment of the afternoon before he was standing at the top of the stairs with his younger daughter Karleen; that several officers approached and told him to leave the building. He asked them if he was under arrest and they said he was not but they wanted him to get out. They said they did not want him hanging around. They spoke in a quiet tone of voice; they were in uniform. He left the building. He said other people were present, standing in the hallway, back toward the courtroom from the head of the stairs where he was standing; he thought there were three, but he did not know who they were. A motion for a mistrial was denied. There is no error here. Clearly, it was within the discretion of the court to deny the motion, and indeed it is questionable whether any other action of the court would have been proper. There is no explanation in the record as to why the officers would forbid appellant the right to be in the court house. There may have been justification. If there was not, then their conduct was wrongful. However, we cannot see that it could have affected the

appellant's right to a fair trial. It was not shown that any member of the jury was advised of the incident.

The judgment is affirmed.

Peek, J., and Schottky, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 5, 1956. Carter, J., was of the opinion that the petition should be granted.