[Crim. No. 8850.   Second Dist., Div. Three.   May 14, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. PAUL
SAMUEL PORTER, Defendant and Appellant.

Cornell Ridley for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

FILES, J.—Defendant was convicted of a violation of section 11530 of the Health and Safety Code (possession of marijuana) and violation of section 12021 of the Penal Code (possession of a revolver by a convicted felon). He has appealed from the judgment. The sole question presented is the legality of the entry and search by which the marijuana and the revolver were discovered in defendant's apartment.

The trial was by the court, a jury having been waived. The court found that the defendant had consented to the search, and on that basis received the evidence. Inasmuch as the question is one of fact (see *People* v. *Shelton,* 60 Cal.2d 740,· 746 [36 Cal.Rptr. 433, 388 P.2d 665]), the People have the benefit of the trial court's finding if it is supported by substantial evidence. The People's case rests entirely upon the testimony of Deputy Sheriff Iavelli, which will be summarized.

Defendant shared an apartment with another ex-convict, Willard Harris. On August 12, 1962, at about 3 a.m., Deputy Sheriff Iavelli, Sergeant Keeney and two federal agents came to the premises. Sergeant Keeney and one federal agent stood on the front porch and rang the bell, while the other two checked the rear. Deputy Sheriff Iavelli testified that he heard the bell and then a voice from the inside asking, "Is that you, Bill?" Sergeant Keeney said, "Yes." Iavelli then heard the door open. As he returned to the front porch he saw that the door was open approximately half way. Ser-

geant Keeney, who was then on the porch, removed his badge and identification card from his pocket and displayed them, but the witness could not see the person who was inside. What happened next is described by the witness as follows: ''Q. Relate this conversation. A. Sergeant Keeney, as I stated, identified himself and stated that a narcotic investigation was in progress. He further stated that Harris had been arrested and had given permission to search the location. Q. What did the defendant say, if anything? A. Sergeant Keeney asked if we may come in. Defendant said, 'Come in.' We then proceeded inside the location. Q. Did you ever hear any conversation between Sergeant Keeney and the defendant concerning consent to search this apartment? A. Yes. At this time Sergeant Keeney asked him about two guns and two jars of pills. He stated he didn't know anything about it. Sergeant Keeney asked him if he could search the premises. Defendant said, 'Yes, go ahead.' Q. What happened then? A. We proceeded to search the premises.''

On cross-examination Deputy Sheriff Iavelli described the conversation at the front door in these words: ''Q. What did he say? A. Well, he advised him that he was a Deputy Sheriff, that a narcotic investigation was in progress. He further stated that Harris had been arrested and had given permission to search the location, as a joint tenant, I believe. At this time Sergeant Keeney asked this party if we could enter the location. They stated, 'Yes.' Q. Is that the entire conversation? A. In substance.''

The search revealed a revolver which had been hidden under the sink and a package of marijuana cigarettes in the pocket of a hunting vest which was in the bedroom closet.

Defendant testified to a somewhat different version, as follows: When the doorbell rang, he was asleep in a bed close to the door. When the person on the porch identified himself as ''Bill,'' defendant raised himself up and ''flipped the lock on the door and got back under the covers.'' The officers then entered and commenced a search. An officer told him that Bill had two guns and some bottles of pills in the apartment. The officer said, ''Do you mind if we look?'' and defendant replied, ''No, because I have no knowledge of it.''

█ Since the search was made without a warrant, the People had the burden of proving facts sufficient to justify it. (*People* v. *Shelton,* 60 Cal.2d 740, 744 [36 Cal.Rptr. 443, 388 P.2d 665].) The trial court did not pass upon the question

of probable cause, and the Attorney General does not contend that the judgment could be affirmed upon that ground.

█ The claimed consent given by Harris cannot be relied upon to justify the entry. There is no evidence that Harris did consent. Deputy Sheriff Iavelli testified that Sergeant Keeney had told him that Harris had given permission, but this testimony was received as a part of a conversation which the witness had had with Sergeant Keeney concerning the arrest of Harris. That testimony was, in the words of the district attorney, ''limited to probable cause.'' This statement by the prosecutor is a concession that the conversation was offered only to prove that Deputy Sheriff Iavelli had probable cause to believe that contraband would be found in defendant's possession at the apartment. Being so limited, the testimony was not evidence that Harris had given consent to search. (*Smith* v. *Kiger,* 5 Cal.App.2d 608, 614 [43 P.2d 565].)

█ Moreover, the consent of Harris, given while away from the premises, would not destroy defendant's right to be secure in his home. ''A joint occupant's right of privacy in his home is not completely at the mercy of another with whom he shares legal possession.'' (*Tompkins* v. *Superior Court,* 59 Cal.2d 65, 69 [27 Cal.Rptr. 889, 378 P.2d 113].)

█ The words of consent spoken by defendant after the officers had entered would not legalize the search if the initial entry was obtained by unlawful force or wrongful deception.

█ ''A search or seizure made pursuant to a valid consent before any illegal police conduct occurs is obviously not a product of illegal conduct. A search and seizure made pursuant to consent secured immediately following an illegal entry or arrest, however, is inextricably bound up with the illegal conduct and cannot be segregated therefrom.'' (*People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927].)

The crucial question thus becomes whether or not actual consent was given by defendant before the officers made their entry.

█ The record contains no evidence that the defendant himself opened the door. Deputy Sheriff Iavelli did not see who opened the door, and he was unable to see defendant in the doorway when Sergeant Keeney was explaining the purpose of the visit.

It was an unlawful invasion of the security of defendant's home for the officers to cause the door to open, even if the

defendant pulled it open upon the representation that "Bill" was outside.[1] After the privacy of the home had been breached at 3 a.m., officers stood in the open doorway to tell defendant "that Harris had been arrested and had given permission to search the location, as a joint tenant. ..." The coercive effect of such an intrusion was not dissipated by the fact that the officers put their request in the form of a question. The circumstances here cannot be equated with the facts found in *People* v. *Burke,* 47 Cal.2d 45, 49 [301 P.2d 241], where the court held that it was not unreasonable for officers, without show of force or coercion, to call upon the suspect at his home, to ask him questions, and to accept his consent to search. Rather, under the circumstances of the present case, defendant's affirmative response must be regarded as submission to a show of force. (Cf. *People* v. *Shelton,* 60 Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665]; *People* v. *Haven,* 59 Cal.2d 713 [31 Cal.Rptr. 47, 381 P.2d 927]; *Castaneda* v. *Superior Court,* 59 Cal.2d 439 [30 Cal.Rptr. 1, 380 P.2d 641].)

The judgment is reversed.

Shinn, P. J., and Ford, J., concurred.

---

[1]The Attorney General's brief suggests, somewhat delicately in a footnote, that "from all that appears in the record, Sergeant Keeney's first name may well have been 'Bill.' " The case does not turn upon whether the sergeant had the same nickname as defendant's roommate. There is no reasonable basis for inferring that any of the four officers who approached defendant's home was the "Bill" whom defendant was expecting and for whom he was willing to unlock the door to an apartment at 3 o'clock in the morning.