[Crim. No. 7975. First Dist., Div. Two. Apr. 21, 1970.]

THE PEOPLE, Plaintiff and Appellant, v.
SHIRLEY MYLES, Defendant and Respondent.

## COUNSEL

Thomas C. Lynch, Attorney General, Robert R. Granucci and John T. Murphy, Deputy Attorneys General, for Plaintiff and Appellant.

Edward T. Mancuso, Public Defender and Charles G. Warner, Deputy Public Defender, for Defendant and Respondent.

## OPINION

**SHOEMAKER, P. J.**—Defendant Shirley Myles was charged by information with possession of a concealable firearm by a felon. Defendant moved to set aside the information pursuant to Penal Code, section 995, and the court granted the motion. The People appeal from the order setting aside the information.

The facts are without dispute. At 1 a.m. on August 21, 1968, Officers O'Sullivan and Damon of the San Francisco Police Department had occasion to drive past a hotel located at 320 Valencia Street. The two officers were wearing plain clothes and were driving an unmarked car. The officers noticed a 1956 Cadillac parked near the hotel and also noticed that the passenger seat of the vehicle was occupied by a man. As the officers drove past, the man crouched down in his seat as though he were trying to avoid being seen. The officers backed up, parked behind the Cadillac and activated the red lights in the police vehicle.

The officers then approached the man in the Cadillac and identified themselves as police. They asked the man why he had slid down in his seat as they approached and also asked him if he had recognized them as police officers. He answered the latter question in the affirmative. They then asked him his name, and he answered by giving them two different names. He seemed incoherent and continually looked in the direction of the hotel.

After Damon had radioed for a records check and had ascertained that there were no warrants outstanding under either name which the man had

given, the officers asked the man if he owned the Cadillac. He replied that he did not. When he was asked who did own the car, he stated that he didn't know the name of the owner but that he had gone into the hotel. The officers checked the registration on the Cadillac and found that it was registered to Mr. Shirley Myles, the defendant.

While Damon remained with the man in the Cadillac, O'Sullivan entered the hotel and ascertained that defendant Myles was registered at the hotel. He returned and told this fact to Damon. The man in the Cadillac, who overheard O'Sullivan's remarks, responded by jumping from the car and running from the scene. The officers did not pursue him, but instead decided to check on defendant Myles.

The officers entered the hotel, talked to the manager and learned the location of defendant's room. The manager told them that defendant had returned to his room approximately 10 minutes earlier, after being absent for a period of three or four days. The manager then escorted the officers into a kitchen and showed them that it was possible to climb through the kitchen window onto a ledge located outside the building between two floors. The rear window of defendant's room could be observed from the ledge.

O'Sullivan then climbed out the window onto the ledge and saw that the blind over defendant's window was pulled down. However, the blind was not quite flush with the window and "wavered" approximately three or four inches on either side of the window, so that he was able to see into the room, where he saw defendant Myles seated on a bed with a gun lying some two to four feet from him. Defendant had a needle and syringe in his hand and was in the process of injecting something into his arm.

Thereafter the officers stationed themselves outside the door to defendant's room and waited. In a few minutes defendant emerged from his room, carrying a brown paper grocery bag, and the officers identified themselves as police. In the bag the officers found a loaded gun, needles, syringes, vials of pills and white residue, and some credit cards. Defendant was questioned and was somewhat vague as to whether he had a prescription for the needles. He did state that he was under medical care at the time and indicated that he had prescriptions for some or all of the drugs in his possession. He also stated that the gun and the credit cards had been left in his room by someone else and that he wanted to get rid of them. Defendant admitted that he had previously been convicted of a felony and had served a term in San Quentin. The officers therefore arrested him for a violation of Penal Code, section 12021, and took him into custody.

The sole issue is whether Officer O'Sullivan conducted an illegal search when he climbed onto the ledge and observed the interior of defendant's

room through gaps in the closed window blind. We are satisfied that the officer did do so.

In *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288], and *Britt* v. *Superior Court* (1962) 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817], it was held that the police were not entitled to conduct a secret surveillance of individuals occupying private booths in men's restrooms when the police lacked probable cause to believe that the individuals were engaged in any sort of unlawful activity and the police made their observations from an area not accessible to the general public. In the *Britt* decision, the court pointed out that although clandestine police surveillance of premises devoted to common use by the general public was obviously permissible, the police did not possess a license to surreptitiously invade the right of personal privacy of persons in private places. "Man's constitutionally protected right of personal privacy not only abides with him while he is the householder within his own castle but cloaks him when as a member of the public he is temporarily occupying a room—including a toilet stall—to the extent that it is offered to the public for private, however transient, individual use." (*Britt* v. *Superior Court, supra*, at p. 472.)

The rule espoused in *Bielicki* and *Britt* has since been further clarified, and our Supreme Court has stated that where the police lack either a warrant or probable cause to conduct a search, the appropriate test for determining the legality of the search is whether the person being observed has exhibited a reasonable expectation of privacy and, if so, whether that expectation has been violated by unreasonable governmental intrusion. (*People* v. *Bradley* (1969) 1 Cal.3d 80, 84 [81 Cal.Rptr. 457, 460 P.2d 129]; *People* v. *Berutko* (1969) 71 Cal.2d 84, 93 [77 Cal.Rptr. 217, 453 P.2d 721].)

Officers O'Sullivan and Damon had no reason to suspect, prior to O'Sullivan's clandestine observation of defendant's room, that defendant was engaged in any sort of criminal activity. The man whose furtive actions caused the officers to investigate him had no apparent connection with defendant.

The Attorney General makes no attempt to contend that the events which occurred before the officers entered the hotel gave them cause to believe that defendant was engaged in unlawful conduct of any kind.

The Attorney General relies on several cases. All are readily distinguishable. In *People* v. *Cove* (1964) 228 Cal.App.2d 466 [39 Cal.Rptr. 535], the officers were investigating a citizen's complaint that defendant had just threatened a woman with a gun. Although one of the officers did look

through a window at the rear of defendant's apartment, the window was apparently uncovered and the officer did not make his observations from an area not accessible to the general public. In *People* v. *Andrews* (1957) 153 Cal.App.2d 333 [314 P.2d 175], the police, who already had reasonable or probable cause to arrest defendants, merely looked through an open window from an adjacent alley. *People* v. *Williams* (1963) 218 Cal.App.2d 86 [32 Cal.Rptr. 277], involved police observations made from the common hallway of an apartment building through the open door of defendant's apartment, and *People* v. *Escoto* (1960) 185 Cal.App.2d 599 [8 Cal.Rptr. 488], involved police observations made through the open door of a shack. *People* v. *Willard* (1965) 238 Cal.App.2d 292 [47 Cal.Rptr. 734], the final authority relied upon, involved police observations made through the open door and window of a house.

The order setting aside the information is affirmed.

Agee, J., and Taylor, J., concurred.