[L.A. No. 29727. In Bank. Aug. 10, 1970.]

THOMAS RICHARD MANN et al., Petitioners, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Garza & Kassel, Donald W. Jordan, Jr., and Lawrence W. Novack for Petitioners.

No appearance for Respondent.

Lowell E. Lathrop, District Attorney, and John Arden, Deputy District Attorney, for Real Party in Interest.

**OPINION**

**WRIGHT, C. J.**—Petitioners were charged by information in San Bernardino County with possessing marijuana and maintaining a place for narcotics use (Health & Saf. Code, §§ 11530, 11557). They pleaded not

guilty and moved under Penal Code section 1538.5 to suppress the evidence, consisting of marijuana, on the ground that it was obtained as the product of an unlawful search. After an evidentiary hearing, the trial court denied the motion in a three-page memorandum order in which it set forth its findings and conclusions. In this proceeding petitioners seek a writ of mandate directing the trial court to suppress the challenged evidence. We have concluded that the writ should be denied.

The People called only one witness at the hearing, Lieutenant Edward F. Olmos of the Redlands Police Department, who had been with the Vice and Narcotics Detail for 10 years. Lieutenant Olmos testified substantially as follows: In the afternoon of January 31, 1969, he received a call from Chief Graefe of the Redlands Police Department. Chief Graefe told him he had received a call from a Mr. Simpson, the assistant superintendent of schools in Rialto, who stated that he had reason to believe there had been marijuana parties at 161 East Crescent Avenue, at the corner of York Street, in Redlands, the residence of several high school teachers in the Rialto and Yucaipa Unified School Districts. He further stated that there might be such a party there that night. Lieutenant Olmos said he would investigate the report that night when he went on duty.

About 7:15 p.m., Lieutenant Olmos went to the residence. He noticed several cars parked in front of the house and saw one vehicle park and two or three people get out and enter the house. He parked his car and walked along an alley behind the house. Music and voices were coming from inside, which indicated to him that a party was in progress. Lieutenant Olmos remained for a few minutes, then left, picked up Detective Hannebaum and Sergeant Bushnell, and returned about half an hour later. The officers parked in an alley across York Street and radioed for additional officers to be stationed within a block or two of the residence in case help was needed.

At Lieutenant Olmos' direction, Sergeant Bushnell stood at the rear entrance to the house. Lieutenant Olmos and Detective Hannebaum walked around the side of the house through an orange grove to the front of the house where three windows opened into the dining room. Lieutenant Olmos was aware that they were on private property at the time.

There were bushes along the house in front of the windows. The bushes were so close to the house that their branches touched the windows and house. To get a clear view through the windows, the officers stood between the bushes and the house. Heavy drapes at the sides of the windows did not substantially obstruct the officers' view, and they could see what was going on inside through the thin curtains that covered the windows. Lieutenant Olmos at first denied that there were any drawn shades on the windows, but

on cross-examination he admitted that there might have been shades drawn to within two or three feet of the sill, but that in any event they did not obstruct his vision in any way.

Lieutenant Olmos and Detective Hannebaum observed the activities in the dining room for about 15 minutes from this position. Two young women were seated at the dining room table and three or four men were standing towards the back of the room. There were other men walking in and out of the room. On a table was a water pipe, or hookah. One man walked over to the hookah, picked up the top portion of it, which normally holds the substance to be smoked, and appeared to smell it. Another man came in and poured some liquid into the bottom portion of the hookah, as though preparing it for use. At another point, Lieutenant Olmos observed a man smoking a cigarette in a manner that suggested it was a marijuana cigarette, that is, by cupping it with both hands and drawing on it in a way that Lieutenant Olmos had come through training and experience to associate with the smoking of marijuana. The cigarette itself did not appear to be an ordinary cigarette. Finally, the officer recognized one of the men in the room as a person he had previously investigated in connection with a narcotics case. The officers then saw someone stagger, as though drunk, out the front door to a car, remove something from under the seat, and carry it back to the house. About two minutes later another car drove up and three persons got out and entered the house.

Ten to fifteen seconds thereafter, Lieutenant Olmos and Detective Hannebaum left their position by the window and walked up to the front door. Lieutenant Olmos knocked on the door—three or four raps in succession—with a fair amount of force to be heard above the music and talking that was going on inside. After 15 or 20 seconds, he knocked again three or four times, harder and louder than the first time. He then heard a male and a female voice simultaneously say "Come in." He opened the door and was greeted with a strong odor of marijuana smoke.

After he entered the house, Lieutenant Olmos gathered everyone into the living room and placed them under arrest. Petitioners, who lived at the house, were among those present. After other officers arrived, Lieutenant Olmos and Detective Hannebaum searched the house.[1] They found a plastic bag containing marijuana on the stairway leading upstairs, a round plastic container with marijuana in a filing cabinet in the bedroom, and traces of marijuana in a jacket on a chair in the dining room, in a package underneath the sofa in the living room, in a bag under the center cushion of

[1]Because this search took place prior to June 23, 1969, the date of *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], its scope was not limited by the rule of that case. (*People* v. *Edwards* (1969) 71 Cal.2d 1096, 1106-1110 [80 Cal.Rptr. 633, 458 P.2d 713].)

the sofa, and in an ashtray. They also found a "roach clip," used for holding a marijuana cigarette, in another ashtray and a package of Zig-Zag cigarette papers on the dining room table.

The defense witnesses included seven of the young people who were at the party as well as the two petitioners. Their testimony was substantially in agreement that the door was left ajar after the arrival of the three guests who came in immediately before the officers entered; that the music and voices were not so loud that normal conversation was impeded; that the officers did not knock before entering; that no one said "Come in"; and that the only odor in the room was that of ordinary cigarette smoke, not marijuana smoke, although petitioner Mann did admit seeing someone smoke marijuana earlier in the evening.

The testimony of these witnesses was in some disagreement as to the manner in which the officers entered. Some of the witnesses described the officers as having "sneaked" or "slipped" in the partially open door immediately behind the last three arrivals. Others said the door was nearly closed, but the latch had not clicked shut. One witness testified that he noticed the door was unlatched and he stepped toward it and reached out to push it shut when Lieutenant Olmos pushed it open from the other side. Estimates of the time elapsed between the entry of the last three guests and the entry of the officers varied from a few seconds to a minute or so.

Petitioner Wright testified that he checked the dining room and other windows shortly after people began to arrive and that the shades on the dining room windows were drawn to within an inch or two of the sill. His purpose was to insure a normal amount of privacy. He also said that he and the other residents of the house usually kept the shades drawn in the evening so they could walk around in their underclothes without being seen from the street. He admitted that the shades were not drawn all the way down, but stated that they were drawn far enough so that no one could see in from the street.

We note at the outset, as respondent concedes, that the officers did not have probable cause to arrest the occupants of the house solely on the basis of the information supplied by Simpson. ■ Although they might assume from Simpson's position as assistant superintendent of schools that he was personally reliable, it does not appear that Simpson witnessed marijuana parties at the house or himself overheard petitioners or others planning such a party for the night in question. At most the officers could assume that Simpson was passing on information from an undisclosed source the identity and reliability of which in no way appears. Such information is not suffi-

cient to constitute probable cause for an arrest or search. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 479 [9 L.Ed.2d 441, 450, 83 S.Ct. 407]; *Aguilar* v. *Texas* (1964) 378 U.S. 108, 110, 114 [12 L.Ed.2d 723, 725, 728, 84 S.Ct. 1509]; *Spinelli* v. *United States* (1969) 393 U.S. 410, 416 [21 L.Ed.2d 637, 643, 89 S.Ct. 584]; *People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-182 [77 Cal.Rptr. 785, 454 P.2d 681].) It did justify further investigation, however, and it is the way in which that investigation was conducted that petitioners contend was unlawful.

The officers had entered petitioners' property from an alley at some distance from the rear of the house, walked across the property through an orange grove alongside the house, and placed themselves behind the bushes in front of the dining room windows, from which vantage point they could see what was going on inside the house. Petitioners contend that the physical setting reasonably entitled them to expect privacy within their home, that the officers' conduct unreasonably infringed that privacy, and that such conduct was therefore an unreasonable search in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

It is unnecessary to pass on the merits of this contention. ▉ It may be assumed without deciding that the officers violated petitioners' constitutional right to privacy by looking through the window while trespassing in the shrubbery outside, and that the officers' observations of the conduct in the dining room was a substantial factor in motivating them thereafter to go to the front door and enter the house. We conclude that nevertheless the occupants' consent to the officers' entry dispelled the taint, if any, flowing from the officers' observations at the windows.

The officers were fully justified in going to petitioners' house to investigate the report they had received. According to Lieutenant Olmos' testimony, which we are bound by the trial court's finding to accept as true, he and Detective Hannebaum left their position by the windows after about 15 minutes, walked around to the front of the residence, knocked three or four times on the door, waited, knocked again, and heard two voices say "Come in." ▉ Lieutenant Olmos opened the door and stepped inside. He immediately detected the odor of marijuana smoke. This evidence apparent to his sense of smell, independently of what he saw through the windows, gave Lieutenant Olmos probable cause to believe that a felony was being committed in his presence and to arrest petitioners and their guests. (*People* v. *Marshall* (1968) 69 Cal.2d 51, 57, fn. 2 [69 Cal. Rptr. 585, 442 P.2d 665]; *Vaillancourt* v. *Superior Court* (1969) 273 Cal.App.2d 791, 794-798 [78 Cal.Rptr. 615]; *People* v. *Nichols* (1969) 1 Cal.App.3d 173, 177 [81 Cal.Rptr. 481]; *People* v. *Christensen* (1969)

2 Cal.App.3d 546, 548-549 [83 Cal.Rptr. 17].) The evidence obtained when the door was opened was not tainted merely because the officers might not have approached the front door but for their observations through the dining room windows. ■ Not "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455].) Rather, the appropriate test is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 488 [9 L.Ed.2d at p. 455]; *People* v. *Johnson* (1969) 70 Cal.2d 541, 546 [75 Cal.Rptr. 401, 450 P.2d 865]; *People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321].)

The defendant's consent may constitute such a sufficiently distinguishable means if it is not induced by compulsion, intimidation, oppressive circumstances, or other similar factors inherent in the situation which make that consent less than an act of free will. (Cf. *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 766-768 [44 Cal.Rptr. 313, 401 P.2d 921].) ■ In the present case, the only event which induced consent to the officers' entry was the sound of knocking at the door. No words of intimidation or assertion of superior authority accompanied that sound, which might have made consent less than an independent act. Nor did the circumstances lead those present to believe that a refusal to admit the caller would have been futile, and thus overbear their will. For all they knew or apparently cared, they might have been extending their invitation to an unwelcome acquaintance, a curious parent, an irate neighbor, or a thief. Consent was quite freely given, and petitioners cannot now complain that those present did not know their callers were police.

A contrary conclusion would not more effectively further the underlying purpose of the exclusionary rule than the conclusion we have reached here. The rule is intended to discourage illegal police conduct in the future. There is little likelihood that the police will be tempted to engage in unlawful searches in reliance on the chance that, if their suspicions are confirmed, a subsequent knock at the door will bring them an invitation to enter. Indeed, assuming that there is unlawful activity going on on the premises, it is extremely unlikely that consent to entry generally will be given as readily as it was here.

Petitioners also contend that the officers' entry was illegal because they did not comply with the requirements of Penal Code section 844. That

section provides that in making an arrest, "a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired." ■ The section thus states the conditions which the police must comply with before making a forced entry. Since the officers' entry here was consented to by persons present inside the house, the section does not apply. (Cf. *Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 321-324 [82 Cal.Rptr. 348, 461 P.2d 628]; *People* v. *Baranko* (1962) 201 Cal.App. 2d 189, 194 [20 Cal.Rptr. 139]; *People* v. *Chacon* (1963) 223 Cal.App.2d 739, 743 [35 Cal.Rptr. 799].)

■ Finally, petitioners contend that the officers obtained their consent to enter by subterfuge and fraud, and that the consent was therefore invalid. (*People* v. *Reeves* (1964) 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393].) There is no merit in this contention.

Cases holding invalid consent to entry obtained by ruse or trick all involve some positive act of misrepresentation on the part of the officers, such as claiming to be friends, delivery men, managers, or otherwise misrepresenting or concealing their identity. (*People* v. *Reeves, supra,* 61 Cal.2d 268; *People* v. *Miller* (1967) 248 Cal.App.2d 731 [56 Cal.Rptr. 865]; *People* v. *Porter* (1964) 227 Cal.App.2d 211 [38 Cal.Rptr. 621]; *People* v. *Hodson* (1964) 225 Cal.App.2d 554 [37 Cal.Rptr. 575]; *Fraternal Order of Eagles, No. 778* v. *United States* (3d Cir. 1932) 57 F.2d 93; see also, *People* v. *Lopez* (1969) 269 Cal.App.2d 461, 466-467 [74 Cal. Rptr. 740]; *People* v. *Sanford* (1968) 265 Cal.App.2d 960, 965-966 [71 Cal.Rptr. 790].) Here there was no such form of active deception. Nor can the timing of the officers' knocking be deemed a form of deception by taking advantage of circumstances. There is nothing whatsoever in the record to indicate that by knocking shortly after guests had entered, the officers implied that they too were invited guests. Moreover, there was no password, no special way of knocking that the officers learned by watching the guests and which, had they imitated, might have been the basis for finding that they misrepresented their identity and deceived the occupants of the house. For these reasons, we hold that the officers acted in a perfectly straightforward and undeceiving way in seeking entry as they did, when they did.

■ Since consent was freely given and not induced by fraud or trickery, the officers' entry was lawful. The odor of marijuana smoke which greeted them constituted probable cause to arrest, and the search of the house was permissible as incident to that arrest. The marijuana discovered in that search is therefore admissible.

The alternative writ heretofore issued is discharged. The petition for a peremptory writ of mandate is denied.

McComb, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**PETERS, J.**—I dissent.

I agree with the majority that the information supplied by Mr. Simpson did justify investigation by the police but did not constitute probable cause to conduct a search. It is clear, as the majority themselves assume, that the manner in which the officers conducted the investigation—by looking through the dining room windows while trespassing in the shrubbery outside—violated petitioners' constitutional right of privacy. Since the arresting officer expressly testified that the only evidence upon which he relied to arrest petitioners and their guests was that obtained by the illegal observations at the windows, the arrests and incidental search of the house are invalid. Moreover, even if in making the arrests the arresting officer had in fact relied on the odor of marijuana which he detected upon opening the front door—as the majority incorrectly presume despite the officer's express statements to the contrary—the consent to his entry was invalid because the prosecution did not sustain its burden of establishing that the arresting officer reasonably and in good faith believed he had the consent to enter of an authorized person; since the consent was invalid, it cannot serve to dispel the "taint" inherent in the illegal search at the windows.

The majority note at the outset that—as conceded by respondent—at the time the police officers entered petitioners' property to observe what was going on inside the house, they lacked either a warrant or probable cause to conduct a search. The majority then assume without deciding that the officers violated petitioners' constitutional right to privacy by looking through the windows while trespassing in the shrubbery outside. This assumption is well warranted under the law of this state. (*People* v. *Bradley,* 1 Cal.3d 80, 84 [81 Cal.Rptr. 457, 460 P.2d 129]; see *People* v. *Edwards,* 71 Cal.2d 1096, 1100, 1104 [80 Cal.Rptr. 633, 458 P.2d 713]; *People* v. *Myles,* 6 Cal.App.3d 788 [86 Cal.Rptr. 274].)

In *People* v. *Bradley, supra,* 1 Cal.3d 80, 84, this court held that where the police lack either a warrant or probable cause to conduct a search, the appropriate test for determining the legality of the search is "whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion (*People* v. *Edwards,* 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713], and cases cited therein)."

The premises in *Bradley* consisted of a house that faced the street, a

driveway that ran along the east side of the house and terminated in a garage at the rear and east of the house, defendant's residence which was attached to the rear of the garage, and a large "fenced in yard" to the west of defendant's residence. The officer, acting on a tip from an informant of unknown reliability that defendant was growing marijuana near a fig tree in the yard, went into the yard to investigate. The marijuana, which was growing in a keg at the base of the fig tree, was partially covered by the leaves of the tree and was not identifiable from the walk along the side of the garage. The tree was about 20 feet from defendant's door. It was necessary for the officer to leave the walk and cross the yard to within almost a foot of the tree to identify the marijuana. A majority of this court held that defendant did not exhibit an expectation of privacy as to the marijuana plants, since they were only partially covered by foliage and were "located a scant 20 feet from defendant's door to which presumably delivery men and others came, . . ." there being no physical barriers between the walkway and the yard itself. (1 Cal.3d at p. 85.)

Applying the *Bradley* test to the facts of the present case, it is clear, first, that the petitioners did exhibit a reasonable expectation of privacy and, second, that the degree of privacy to which they were entitled in the circumstances rendered the particular form of governmental intrusion unreasonable. Unlike the physical surroundings in *Bradley*, the house here was on an acre of ground. There were many trees on the property, including a grove of orange trees behind and along one side of the house. There was shrubbery at a number of places on the grounds. A 50-foot long wall ran along one side of the property. The front yard was two feet below the level of the sidewalk at the east end of the premises and sloped down towards the west end, where it was four feet below sidewalk level. There was a retaining wall along this line of the property. The testimony does not disclose whether the wall extended above the level of the sidewalk. The grounds surrounding the house were obviously not shared with any other house. All in all, the record suggests that the physical layout of the premises by itself may have unambiguously warned the public that the occupiers of the house considered the ground area surrounding it to be private and off-limits to all but invited guests.

If the police had done no more than trespass across the yard to obtain their view of the activities inside the house, it might be necessary to consider further the nature of the physical surroundings and the degree to which those surroundings made it clear that the areas where the police trespassed were intended to be private. However, the officers did not stop at trespassing across the grounds. They also went behind the bushes alongside the house, a place where no member of the public had a right to be. Petitioners' expectation of privacy in such a place was entirely reasonable.

The testimony was in conflict as to how far the shades were drawn on the windows. Petitioner Wright testified that they were within an inch or two of the sill. Petitioner Mann put the figure at less than four or five inches. Lieutenant Olmos stated that the shades were about two to three feet from the sill. The testimony was uncontradicted, however, that the bushes extended above the sill and brushed against the windows. Although it is not clear whether they extended all the way to the shades or how dense they were at that height, Lieutenant Olmos did admit on cross-examination that he could not see clearly into the dining room without stepping between the bushes and the house. Whether or not the officers acted reasonably in crossing the property and approaching the bushes, they were there confronted with a barrier of shrubbery, drapes, curtains, and shades which made it nearly impossible for them to see inside without penetrating further into the space between the bushes and the house. Considering the height and density of the bushes, their distance from any public walkway, and their closeness to the house, petitioners' belief that the area between the bushes and house was and would remain private was reasonable.

I am further satisfied that the particular form of governmental intrusion disclosed by the evidence was unreasonable. There were no exigent circumstances present which might have justified a search on the basis of suspicion less than probable cause,[1] nor did the officers make any attempt to investigate by other means or to substantiate the trustworthiness of their informant by querying him as to the source of his information. The nature of the complaint they had received made it unreasonable for them to head straight for the bushes.

It is thus clear that—as the majority themselves assume—the officers violated petitioners' constitutional right to privacy by looking through the windows while trespassing in the shrubbery outside.

However, the majority uphold the arrests of petitioners and their guests by arguing: (1) even assuming that the officers would not have approached the front door "but for" their observations at the windows, any "taint" flowing from these observations was "dispelled" by the consent of two of the occupants; and (2) the odor of marijuana smoke detected by Lieutenant Olmos after he opened the door and entered the house upon being given

---

[1]For example, if the police were in hot pursuit of an armed suspect whom they knew had taken refuge in one of several houses, they might well be justified in making an exploratory search of those houses in the manner held unlawful here. Such a search would presumably be reasonable in light of the imminent danger to themselves and to innocent citizens.

such consent, "independently of what he saw through the windows," gave him probable cause to arrest petitioners and their guests.

The majority's argument is not sound, since it completely ignores the testimony of Lieutenant Olmos that, in making the arrests, he relied *solely and exclusively* on the evidence obtained by his illegal observations, and that he did not rely to any extent whatsoever on the odor of marijuana smoke: "Q [by defense counsel] As you were knocking on the door, at that time you intended to arrest all the occupants of that house except the three which you followed in, is that correct? A [by Lieutenant Olmos] Correct. Q And you had reached that conclusion after seeing what you saw in the window? A That is correct. Q And, therefore, when you walked into the house and smelled the odor of marijuana, that certainly did not contribute to your conclusion in that regard, is that correct? A Just confirmed my suspicions. Q But it was an element, as far as you are concerned, of reaching that particular conclusion? A No, sir. Q I beg your pardon? A No, sir."

*Terry* v. *Ohio* (1968) 392 U.S. 1, 21 [20 L.Ed.2d 889, 905, 88 S.Ct. 1868], requires that *the police officer* point to the facts upon which he relied in acting as he did. Courts are not free to uphold searches on theories negated by the officer's own statements. "Information which may be available to an arresting officer, but upon which he did not rely in making an arrest cannot be used to justify the arrest." (*People* v. *Hunt*, 250 Cal.App.2d 311, 315 [58 Cal.Rptr. 385]; cf. *People* v. *Gallegos*, 62 Cal.2d 176, 178 [41 Cal.Rptr. 590, 397 P.2d 174].)

I do not dispute the majority's holding that the odor of marijuana smoke may in some cases constitute probable cause for an arrest. However, this court cannot uphold the arrests in the instant case on the ground that the odor of marijuana smoke provided the arresting officer with probable cause for the arrests when the officer himself specifically stated that he did not rely to any extent whatsoever on the odor of marijuana smoke in making the arrests.

Since, according to his own testimony, the only evidence upon which Lieutenant Olmos relied to arrest petitioners and their guests was that obtained by his illegal observations at the window, the arrests and the incidental search of the house are invalid.

Moreover, even if Lieutenant Olmos had in fact relied on the odor of marijuana smoke for probable cause to arrest, the arrests would be invalid. The majority argue that the occupants' consent to entry dispelled any taint flowing from the officers' observations at the window. However, the consent to Lieutenant Olmos' entry, if invalid, cannot serve as an intervening inde-

pendent act so as to dispel the "taint" inherent in the illegal search at the window. (Cf. *People* v. *Superior Court,* 71 Cal.2d 265 [78 Cal.Rptr. 210, 455 P.2d 146].) And, in my opinion, the consent was clearly invalid.

If the prosecution is to rely upon a consent to enter a house, it has the burden of establishing that the police officers reasonably believed in good faith that they had the consent of a person authorized by the resident to give that consent. (*People* v. *Roberts,* 47 Cal.2d 374, 377 [303 P.2d 721]; see also *People* v. *Johnson,* 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921].) In the instant case, no attempt was made to establish such a belief, and the evidence clearly indicates that no such reasonable, good faith belief existed.

Lieutenant Olmos testified that, after he knocked on the door a second time, he heard a male and female voice say, almost simultaneously, "Come in," and that he thereupon opened the door and entered. He never suggested that he believed either voice belonged to one of the residents; indeed, he must have known that the female voice could not have belonged to a resident, since he had been informed by Chief Graefe that the residents were males. And it is not reasonable to assume, without more, that every person present at a large party is authorized by the resident or residents to consent to entry by others. "There is no reasonable basis for a general assumption that every person who happens to be in a house has authority to permit police officers to do acts on the premises which they could not legally do without such permission." (*People* v. *Carswell,* 149 Cal.App.2d 395, 401 [308 P.2d 852] [holding that police officers could not reasonably and in good faith believe that a man who was painting the premises and who opened the street door when the officers knocked was authorized to permit the officers to enter]; see also *People* v. *Jennings,* 142 Cal.App.2d 160, 168-169 [298 P.2d 56].)

Lieutenant Olmos could not tell whether the three men who preceded him into the house were admitted into the house by those within or opened the door and entered themselves. As far as he knew, they could have been the residents or close friends who were authorized to, and did, enter without an invitation. Thus it cannot be argued that Lieutenant Olmos could reasonably have believed that he was admitted in an authorized manner because he was admitted in the same manner in which he observed the three men to be admitted.

Since the prosecution did not sustain its burden of establishing that Lieutenant Olmos reasonably and in good faith believed that he had the consent to enter of a person or persons authorized to give that consent, the consent

is invalid, and, as such, cannot serve to dispel the "taint" inherent in the illegal search at the windows.

In sum, the officers violated petitioners' constitutional right to privacy by looking through the windows while trespassing in the shrubbery out-side—as the majority assume. Since the only evidence upon which the arresting officer relied to arrest petitioners and their guests was that obtained by such illegal observations, the arrests and the incidental search of the house are tainted and therefore invalid. Moreover, even if the arresting officer had in fact relied on the odor of marijuana smoke to make the arrests—as the majority incorrectly presume despite the officer's express statements to the contrary—the consent to his entry was invalid and there-fore could not serve to dispel the "taint" flowing from the illegal search at the window.

I would issue mandate.

The application of petitioner Mann for a rehearing was denied Sep-tember 3, 1970. Peters, J., was of the opinion that the petition should be granted.